In the Matter of the Estate of CHARLES WITKIND, Deceased.

Surrogate's Court, New York County, May 23, 1938.

*Aaron Frank*, for the executors.

*Adrian P. Burke*, special guardian for infants, objectant.

*Harold E. Horowitz*, for Isabelle T. Witkind, individually.

*Isidore Witkind* [*Sidney R. Rossiter* of counsel], for Pauline Sherman and others.

*John J. Bennett, Jr.*, Attorney-General of the State of New York.

DELEHANTY, S.   On March 6, 1930, deceased was notified that he had to undergo an operation.   The next day he made his will. Six days later he died.   To act as his executors and trustees he named his wife and his brother-in-law, Samuel Wacht, Jr.   They qualified on April 10, 1930.   For many years prior to the death of deceased Mr. Wacht was associated with him in business.   They were costockholders of close corporations holding realty.   Mr. Wacht also acted as attorney for deceased and was his partner in a bank stock brokerage business.

A simple testamentary scheme is presented by the will.   After making provisions for a gift to charity and for the creation of three relatively small trusts in favor of two sisters and a brother (construction questions concerning these gifts were raised but were settled by a stipulation heretofore approved by the court) deceased divided his residuary estate into six parts.   Three parts were placed in trust for the benefit of his widow.   From this moiety she was to receive outright $25,000.   The remaining three parts were appropriated severally to trusts for the use of the three children of the deceased.   Authorization was given to invade the principal of the trust for the benefit of the widow should this prove necessary in order to bring her annual return therefrom to the sum of $10,000. Omitting further details, it suffices to say that the children, provided

they outlive the widow and attain to certain ages respectively, are the primary remaindermen both of the widow's trust fund and of the funds directly devoted to their individual use.

The powers granted the executors and trustees are found in the tenth paragraph of the will, as follows:

" I authorize my Executors and Trustees, or the survivor of them, or their successor or successors, as follows:

" (1) To sell, lease, mortgage and exchange all or any part of my estate, both real and personal, at such times and at public or private sale, and upon such terms and conditions as they may deem best in order to carry out the provisions of this my Last Will and Testament, giving and granting to my Executors and Trustees full power and authority to make proper conveyances and transfers of my estate both real and personal.

" (2) At the risk of my estate, and without responsibility to my Executors, to continue, and in their sole discretion, to turn over as part of the shares of my estate hereinbefore given, devised and bequeathed, and in the erection of the trusts herein created, any real estate, stocks, bonds or other investments in which at the time of my death any portion of my estate shall be invested.

" (3) At the risk of the trust funds, and without responsibility to my Trustees, to continue to retain any real estate, stocks, bonds or other investments in which at the time of my decease any portion of my estate shall be invested although not of the character authorized for trust investments under the laws of the State of New York, or to dispose of, call in and change any and all investments, and to invest and reinvest the proceeds thereof, or any uninvested funds, in such securities and investments as my Trustees shall deem proper, although not of the character authorized for trust investments under the laws of the State of New York."

In addition to this the deceased by the sixteenth paragraph gave his fiduciaries " the amplest and fullest powers to carry into effect and to accomplish the purposes under the terms of this * * * will."

The original account covered transactions from the date of death to June 30, 1936. By affidavit supplementing and amending this account the executors reported their transactions to April 2, 1937. An affidavit in the nature of an account of the transactions of Witkind Estates, Inc., a corporation wholly owned by the estate, was filed and with it a stipulation of facts bearing on the estate administration. These accounts and the data agreed upon in the stipulation together with oral evidence received on the hearing furnish the record upon which the objections filed by the special guardian of deceased's children are to be determined.

The first objection was withdrawn in part. What remains consists of an application to the court to direct the accounting parties to file complete annual audits of Witkind Estates, Inc., Witkind & Co., Sagobel Development Corporation and Armin Development Corporation. As respects W. & W. Development Corporation a portion of the twelfth objection of the special guardian demands the filing of accounts of its transactions. For convenience Sagobel Development Corporation will hereafter be called Sagobel; Armin Development Corporation will be termed Armin and W. & W. Development Corporation will be referred to as W. & W.

So far as the first objection relates to Witkind Estates, Inc., a ruling is now unnecessary by reason of the fact that the accounting sought by the special guardian was supplied subsequent to the making of his objections.

To the extent that the objection relates to failure to file accounts in behalf of Witkind & Co. it must be overruled. Witkind & Co. was a bank stock brokerage business conducted by three general and two special partners. Partnership articles of the business were executed on October 1, 1929. The nineteenth clause thereof provided that death of a partner should not effect a dissolution of the firm. As to a deceased partner, his interest was to be valued by the surviving partners as of the date of death "from the books of the partnership; and such interest, as so determined, shall be liquidated, and the amount thereof shall be paid to the representatives of such deceased partner, within six months thereafter, with interest at the rate of six per cent per annum to the date of such payment." In virtue of this contractual arrangement the special guardian is not entitled to have an account of the transactions of Witkind & Co. subsequent to deceased's death. His concern with the partnership is necessarily limited to the determination of whether the deceased's interest was properly valued and properly paid. That subject is discussed later.

So much of the objections as seek a direction to the executors to file accountings of transactions of Sagobel, Armin and W. & W. requires extended comment. Since Armin is a wholly owned subsidiary of Sagobel it will be discussed in conjunction with Sagobel. Sagobel was organized in 1922 to take title to two parcels of realty which it continues to own. The authorized capital stock was 2,500 shares, par value being $100 per share. At all times prior to death of deceased the sole stockholders of the corporation were the deceased, the executor Samuel Wacht and the latter's law partner Joseph Cohen. Mr. Cohen was attorney for the estate until 1934. Prior to the death of deceased the capital stock of the corporation was reduced to forty-eight shares, sixteen of which

were held by each of the three stockholders. By reason of the reduction in capital stock and due to the acquisition by the corporation of additional real estate first held directly and thereafter through its subsidiary Armin, Sagobel became indebted to each of the three stockholders in the same amounts. This debt in favor of deceased amounted at the date of death to $102,733.33 exclusive of accrued interest which amounted to $2,261.27. Subsequently the estate advanced to Sagobel $19,766.67. During the period for which the account is rendered Sagobel paid to the estate $58,668.78 of which $9,761.27 was on account of the principal indebtedness and $48,907.51 was on account of income. The estate has had a six per cent return on the debt for each year except for one year when the rate was five per cent. The loan at the end of the accounting period amounted to $115,000. It is reported unsecured. An objection questions the failure of the executor to get security. The corresponding indebtedness in favor of the executor in his individual capacity and in favor of the latter's former law partner Mr. Cohen likewise are said to be unsecured. The testimony developed the fact that an unrecorded third mortgage exists in favor of these three creditors. The examination of Mr. Wacht (over objection of counsel for the executors) disclosed that after the deceased's death, but not before that time, salaries were paid for several years to Mr. Wacht, Mr. Cohen and to the widow-executrix Mrs. Witkind. Commissions on collection of rents were also paid but this practice together with that of paying Wacht and Cohen legal fees for services rendered the corporation was established in the lifetime of the deceased. The total in salaries and commissions paid after the death of deceased was $89,480.05. Salaries, the last of which were paid in the fiscal year ending October 31, 1932, totaled $43,549.97 while commissions amounted to $45,930.08. The rental totals from Sagobel's properties (including the property of its subsidiary Armin) during the accounting period amounted to $1,837,482.74. The total in salaries and commissions was thus less than five per cent of the gross rents. During the fiscal year ending October 31, 1932, while salaries of $200 a week to Mr. Wacht, $175 a week to Mrs. Witkind and $150 a week to Mr. Cohen were being paid, no interest on the estate debt due from the corporation was collected by the executors. Mr. Wacht when testifying respecting the salaries stated that they were paid solely by reason of the fact that during the period of their payment it was imperative that special attention should be given the realty owned directly or indirectly by Sagobel to meet emergencies created by the depression and by changes in neighborhood necessitating (notably in the case of the property located on Broadway and

One Hundred and Fifteenth street) changes in the structure of the building. He testified that during the three years when he received a salary most of his time was given over to Sagobel's business. As further evidence of his good faith he pointed out that, with Mr. Cohen, he personally guaranteed the $90,000 second mortgage on the realty held by Armin so that an extension for a definite period could be obtained. Their action inured to the benefit of the estate which assumed on its part no corresponding liability.

From the foregoing outline of facts developed chiefly at the hearing it is probable that no ground for money surcharge exists. But the question raised by the special guardian at this point primarily relates not to money surcharge on the basis of these facts but to the suitability of a direction by the court requiring the fiduciaries to render an account of the transactions of Sagobel and Armin for each fiscal year in the period subsequent to the death of deceased. If it be appropriate to make such direction a more fundamental question respecting the power of the court yet remains to be determined.

On the question of appropriateness of such a direction in relation to Sagobel, counsel for the executors urges that the special guardian's accountant was given free access to the books of the company and that this accountant has developed for the special guardian all needful facts. This the special guardian, without questioning the good faith of opposing counsel, denies. The court cannot settle a question of fact without evidence. Moreover, the obligation primarily rests on fiduciaries to make complete disclosures of all relevant data pertaining to an estate. In the present state of the record respecting Sagobel there is no convincing proof that the executors so conducted the corporate affairs as to cause either diminution in the value of the stock in the corporation held by the estate or wrongful prevention of the stock's enhancement in value; nor has it been shown that they so behaved as to imperil the soundness of the estate's creditor position. Whether a *complete* disclosure of all facts made by those who have the facts, namely, the executors, would change the complexion of the matter cannot be known until all these facts have been formally provided. An additional observation is necessary — where the court has power to require fiduciaries to report the transactions of corporations in which the estate is interested the question of appropriateness should not be raised. Whether the facts revealed by an accounting in behalf of the corporation activities are or are not important can only be known after they have been exhibited. As a practical matter, therefore, in every case where the court can require dis-

closure of corporate affairs on an accounting by estate fiduciaries it will exercise its power in favor of the disclosure.

The issue thus proves to be one of the power of the surrogate in the situation outlined above. That the court cannot compel the executors to make an accounting in respect of the corporate transactions is a position taken by executors' counsel on two grounds. First he contends that a ruling on the application of the special guardian for an examination of the executors under section 263 of the Surrogate's Court Act has made the law of the case. This ruling said (*Matter of Witkind*, N. Y. L. J. April 30, 1937, p. 2161): "The estate owns a minority interest in two corporations. This interest when added to the stock owned personally by one of the executors gives such executor the controlling interest in these corporations. While no examination of the general corporate affairs may be permitted, the executor must submit to an examination as to such of his acts in relation to the corporation as affect the administration of the estate." This decision is conclusive only on the matter of which it treats, namely, the range of the examination. It does not control nor even relate to the question of the accountability of the fiduciaries for corporate affairs as such. Its tenor is plainly consistent only with the view that the corporate affairs might well be the subject-matter of accountability by the executors. The rulings made on practice motions are not in any case determinative of the major issue in the controversy. (*Bannon* v. *Bannon*, 270 N. Y. 484, 489.) The resort by the special guardian to section 263 of the Surrogate's Court Act might have been supplemented by an interim motion in the accounting proceeding for a direction to the executors to file the accounts of the corporate transactions which are herein ordered to be filed. The court would no doubt have power to entertain such an application and then an order directing the filing of the accounts would perhaps present squarely the question of the power of the court to make such an order. Unless resort to section 263 develops the facts fully it might well happen that the court would be asked to act on insufficient proof of the need for the supplementary accounts. There can be no doubt of the court's power in an accounting proceeding to develop the relevant facts and to make such supplementary direction as the disclosed transactions of the fiduciary seem to require. The court's power in an accounting proceeding being plenary (*Matter of Raymond* v. *Davis*, 248 N. Y. 67) it would be incongruous to say that an order made before full disclosure of the facts constrains the court to refuse to permit them to be disclosed.

Analysis such as the court has been making inevitably returns the discussion to the single fundamental inquiry: Is this a case in

which the fiduciaries may be compelled to disclose corporate transactions fully at their command?

It is not disputed that where a corporation is wholly owned by an estate full report of corporate transactions may be exacted of the fiduciaries. Acknowledging this principle to be correct the fiduciaries here have already made such an account in respect of the affairs of Witkind Estates, Inc. It is also an established principle that in the ordinary case where an estate has only a minority interest in a corporation the fiduciaries cannot be required to render an account of corporate transactions. *This principle is one of practical necessity. Fiduciaries cannot be ordered to do what is impossible.* But where as here the fiduciaries control a corporation by the help of the estate stock interest added to the stock interest held personally by one of them they are not disabled to make such accounts and are, therefore, under obligation to do so. There is nothing sacrosanct about a corporation. It is not an impenetrable screen behind which facts may be successfully hidden. As BIJUR, J., said, in an opinion often cited with approval (See *Pagel, Horton & Co., Inc., v. Harmon Paper Co.*, 236 App. Div. 47, 49; *Matter of Steinberg*, 153 Misc. 339, 346): "A corporation is more nearly a method than a thing, and * * * the law in dealing with a corporation has no need of defining it as a person or an entity, or even as an embodiment of functions, rights and duties, but may treat it as a name for a useful and usual collection of jural relations, each one of which must in every instance be ascertained, analyzed and assigned to its appropriate place according to the circumstances of the particular case, having due regard to the purposes to be achieved." (*Farmers' Loan & Trust Co.* v. *Pierson*, 130 Misc. 110, 119.)

The main objective of the special guardian is ascertainment of the activities of the corporations controlled by the fiduciaries in order that he may form a judgment as to whether the estate has been dealt with fairly. For that purpose the accounting sought is essential. It is, therefore, ordered to be filed. It is impossible to discover how the disclosure can affect adversely any one entitled to be protected. The accounting will reveal whether the fiduciary controlling Sagobel and Armin used his power for the private advantage of himself, the executrix or Mr. Cohen with a resulting injury to the interest of the estate in its stock or creditor position. The result stated here is fully in accord with the import of the decision in *Matter of Auditore* (249 N. Y. 335) and other cases as well. (*Matter of Pulitzer*, 139 Misc. 575; affd., 237 App. Div. 808; *Matter of Gerbereux*, 148 Misc. 461.) The court, it should be added, does not directly intervene in the business of the corporation.

It confines itself to the exercise of its plenary power (Surr. Ct. Act, § 40) to control the conduct of fiduciaries. Such powers as they have it obliges them to exercise though in a purely technical sense they may function as officers of corporations in the exercise thereof. The argument that the court thus ignores the distinction between a fiduciary in his representative and in his individual capacities is without merit. There are situations, and this is one of them, where that highly useful distinction must be transcended. It must be transcended here because the fiduciary Mr. Wacht had the advantage of holding the balance of power over the conduct of this corporation solely by virtue of his possession of the estate's one-third interest therein. He cannot successfully put forth his claims of *individual detachment* from the estate when he has continuously been in a position to hold power and derive profit from his *fiduciary attachment* thereto. It is the latter not the former fact which is decisive of his present obligations.

For the reasons thus stated at large in relation to Sagobel and Armin the court makes a similar direction in respect of W. & W. If there is any difference in the case of this company as compared with Sagobel and Armin it favors the position of the special guardian because here the sole stockholders were the executor, Mr. Wacht and the deceased. As will appear more fully below in behalf of this corporation the estate has made substantial payments to corporate creditors and according to the accounting parties it is bound to make additional payments of the same kind. If these payments were at all warranted it could only be as a result of the corporation's inability to discharge its own obligations. Manifestly, if it is to be shown that the corporation was powerless to pay, it is necessary that a full disclosure of its transactions be made.

Recurring now to the estate's relations with Witkind & Co., the partnership of which deceased was a member, the objection of the special guardian seeks direction from the court requiring the executors to file annual accounts of the partnership transactions. The court ruled at the hearing that the only question open to the special guardian in respect of the partnership dealt with the valuation of deceased's interest therein and the manner of its payment. Thenceforth the hearing continued on the basis that the objection charged that the value was improperly fixed and payment thereof improperly made.

The business began to function on October 15, 1929. Deceased, Mr. Wacht and Mr. Cohen as general partners each made a capital contribution of $33,333.33. Two special partners contributed $5,000 each. The proof shows that in computing the value of deceased's interest as of the date of death no allowance was made

for good will. Of this the special guardian complains but since no evidence suggestive of the presence of good will in the business was forthcoming and since good will is something in a business which "gives a reasonable expectancy of preference in the race of competition" (*Matter of Brown*, 242 N. Y. 1, 6) — an expectancy scarcely to be found for a five months' old brokerage business in March, 1930 — the finding must be made that the asset of good will was either of nominal or of no value.

The surviving partners did not credit the estate with any share in the value of unexpired insurance of which the surviving partners doing business under the name of Wacht & Co. concededly had the advantage. The failure to include the insurance asset was defended on the ground that with deceased's consent the whole item had been written off the books as of the end of 1929. It was shown that notwithstanding this accounting practice it was also the practice of the firm's accountant in his monthly reports in 1930 to carry as an asset that proportion of the insurance value not yet exhausted. It is clear that the insurance was a genuine asset which should have entered into the computation of deceased's interest.

As of deceased's death the partnership had a claim against one Kraus on which $2,500 was subsequently recovered. In computing the estate interest in the partnership this asset was treated as a bad debt. The event disproved the assumption of uncollectibility. It does not appear that Mr. Cohen claimed compensation for the legal services which resulted in the collection from Kraus. Since, therefore, the asset had a value at the time of deceased's death of $2,500 as events subsequent thereto demonstrated, the executors are surcharged for the amount representing the *pro rata* share in the asset belonging to the estate.

A similar determination is made in respect of the rent for March, 1930. To the extent that the prepaid rent money was unused at the date of death the deceased's estate was entitled to a *pro rata* share. The failure of the executors to collect it is ground for surcharge.

The last item to be considered concerns the furniture acquired five months before deceased's death for $1,493.70 and valued at date of death at $750. Several years later it was sold for $100. The mark-off at date of death was not excessive and no ground for surcharge in this connection exists.

The manner of payment to the estate of its interest in the partnership was also improper. The asset was not entirely collected even on the undervalued basis until April 19, 1935. The final payment then made came from Mr. Cohen in the sum of $6,164.43. Interest

on the collections was paid at three per cent. The articles called for six per cent. No sufficient reason appears why six per cent should not have been collected. A surcharge is accordingly made for the uncollected interest.

The monetary implications of the foregoing were not formally stated on the record. The special guardian has specified figures which he claims represent the amounts due. On the settlement of the decree the court will adjust any controversy over figures.

Two arguments made by counsel for the executors should be noticed. He states that the surviving partners did not claim compensation for their liquidating services and that expenses of the business were not on an accrual basis. As a result he claims that if proper allowance for these two items be made an offset would be available to the partnership which would wipe out the estate claims on the additional assets and would offset any surcharge which might be made against the executors for failing to collect the share of the estate in the additional assets. Counsel also contends that the computation of value as actually made was in accordance with and " from the books "— as the articles required. Touching the last point it is enough to say that in contemplation of law the books mentioned in the articles were books which would truly represent the authentic assets of the business. " Books " which wipe out obvious assets for tax or other purposes are not the books which supply the final standard in determining whether the estate of the deceased partner obtained the amount to which it was fairly entitled. Of course as the total mark-off of the unexpired insurance value and the failure to treat the March, 1930, rent on an accrual basis are disapproved by the court the partnership may properly claim credit for expense accruals. If desired, proof of these accrued expenses will be taken. The parties, however, may be able to stipulate the facts. No credit can be allowed, however, to the surviving partners for liquidating activities. Section 40 of the Partnership Law, cited to support the view that such compensation is allowable, does not apply. In terms the statute formulate rules relative to the rights and duties of partners " subject to any agreement between them." Subdivision 6 of section 40, proceeding on the assumption that no such agreement is extant, departs from the common-law rule that liquidating surviving partners are entitled to no compensation for liquidating services (*Caldwell* v. *Lieber*, 7 Paige, 483, 495; *Johnson* v. *Hartshorne*, 52 N. Y. 173, 180; *Slater* v. *Slater*, 78 App. Div. 449, 459; modfd., on other grounds; 175 N. Y. 143; *Stem* v. *Warren*, 227 id. 538, 546, 547) and grants to " *a* surviving partner * * * reasonable compensation for his services in winding up the partnership affairs." It is self-

evident that this statute is not here applicable. The articles are determinative, they comprehend the whole area of a liquidation of a deceased's copartner's interest and they provide for no compensation for liquidating services.

The second objection of the special guardian relates to the Sagobel indebtedness to the estate in the amount of $115,000. Note has already been made that in substantially the same amounts the corporation is indebted to the other two stockholders, Mr. Wacht and Mr. Cohen. The special guardian contends that this debt should be secured by a mortgage. An unrecorded mortgage security exists in fact as has already been stated. The debt has not been collected due to the non-liquid though healthy financial condition of the debtor corporation. At no time between 1930 and 1937 were the free liquid corporate assets in excess of $15,000. Nevertheless enormous payments were made during this period to eliminate bank loans, amortize second mortgages, construct permanent improvements and pay six per cent interest (except for one year) on the debts owed the stockholders which throughout totaled more than $300,000. That the executors, in the circumstances outlined, did not record the third mortgage is not ground for criticism. The second objection is, therefore, tentatively overruled. When the accounts on behalf of Sagobel and Armin have been filed and if no material facts are developed which alter the situation as shown at the hearing the ruling stated will be made definitive.

The third and fourth objections charge that the executors dealt preferentially with all trust beneficiaries other than the infants. During the accounting period payments were made to the widow in the total amount of $38,706.43. Of this sum $18,079.27 was income and $20,627.16 represented payments made from principal pursuant to power given the executors-trustees to invade the corpus so that the widow might have an annual return from her trust of $10,000. During the same period $7,000 was paid to each of deceased's two sisters and $3,500 to his brother. Payments from the principal of these three trusts amounted to $5,080.24 in respect of each of the two funds appropriated to the use of the sisters and to $2,544.71 in relation to that devoted to the use of the brother. Meanwhile the infants were severally debited with sums of $1,250 each representing contributions from their shares in estate funds to discharge their ratable proportion of the liability under the apartment lease executed by deceased in his lifetime and terminating on October 1, 1932. Their shares in the estate were again debited each with the sum of $1,162.52 under date of February 26, 1937. According to the stipulation of fact the $1,250

payments were made to discharge the infant's liabilities for rent for the apartment occupied by them and their mother from the date of deceased's death to October 1, 1932. The $1,162.52 payments represent sums paid to the mother as general guardian pursuant to this court's order of maintenance.

The filed schedules show that the infants' income has been ascertained currently and treated as an outstanding charge on the estate. The ascertainment of the infants' income followed this course: The gross income for each quarter was established; then expenses chargeable to gross and two income commissions thereon were subtracted; and thereby the net income for the quarter was determined. This net was then allocated to the seven trusts which are set up on the books of the estate (three for the infants) and to an account referred to as "residuary corpus" which is a reserve for debts, administration expenses and other charges. This "residuary corpus" was dealt with as having an existence separate and apart from the trusts for the beneficiaries. The account shows that the earned income first appropriated to the account of the residuary corpus was thereafter transferred in proper proportions to the trusts set up for the widow and for the infants. But in the transfer it did not go to the income accounts of the widow's and the infants' trusts but went to swell the corpus of those trusts. This procedure no doubt was adopted under the authority of *Matter of Benson* (96 N. Y. 499; cited with approval in *Matter of Reese*, 260 id. 614, 615). Whether the rules in *Williamson* v. *Williamson* (6 Paige, 298), referred to in *Matter of Benson* as the standard, have been observed is not questioned by the special guardian. The court is not called on to inquire into that phase of the accounts. This portion of the net income of the estate is now present as an accretion to the capital of the respective shares of the infants and of the widow. The income credited to the capital value assigned to the respective trusts for the widow and the infants at the opening of a quarter was credited as true income of these respective trusts. The special guardian questions only the manner in which that part of the net income was treated. On the books of the estate the income thus credited as true income of the infants' trusts is merely entered on the books as a credit to the infants. The special guardian asserts that it should have been paid out to them and that if paid out to them their general guardian would have received it with an obligation to reinvest it and thus the income itself, as capital in the guardian's hands, would have earned and would now be earning further income. He asserts that the infants have lost by the procedure adopted by the accountant. This argument of the special guardian overlooks the fact

that the income thus credited was part of the corpus of the whole estate upon which income for succeeding quarters was earned. The rate of income on estate assets is at least as high as could have been earned on legal investments had the funds been paid out to the guardian from quarter to quarter. Consequently (assuming a proper credit to the infants of income earned on this income retained by the executors) the infants have not lost by the retention. If this were all there would be nothing further to say concerning the objection. But the account shows that the executors have not dealt accurately with the infants even on the basis which they themselves adopted and report in their account. In effect they borrowed the accumulated income due to the infants and used it as part of the capital of the estate. They recorded it on their books, however, as an *income* credit to the infants. When they came to compute the average rate of return on the assets they made the computation only on the average balance *in the principal account*. Thus they ignored the fact that this accumulated income credited to the infants, equally with the property in principal account, had produced the gross income of the estate for the quarter. By using only the average balance *in principal account* they worked out a rate of return which necessarily was higher than was actually earned by the principal account itself. If the rate of return were computed on the basis of the balance in principal account plus the accumulated infants' income a lower average return would be realized. This lower average return would of course reduce the credits for income earned on the corpus of each trust principal and of the account carried as " residuary corpus." The difference between the credit thus granted to these accounts as income and that granted under the system of computation by the executors represents the income earned on the accumulated but unpaid infants' income and should be credited to that latter account. Thus the infants are entitled to have an income credited on the corpus of their trust principals plus an income credited on the balance in their accumulated income account. They have never had a credit on the latter basis. They have had a slightly excessive credit on the former basis. Their true interest in the income is to be restated so as to give them a proper credit on both funds in which they are interested and which contributed to the total earnings of the estate.

The special guardian seeks immediate payment of the amount due the infants in this accumulated income account. The executors seek approval of a plan of liquidation which would involve an assignment to the infants of an interest in the debt due the estate from Sagobel. It is proposed by the executors that a certificate of indebtedness to the infants be issued by Sagobel which will

provide for payments of $100 weekly on account of the accumulated income. The certificate will carry interest at six per cent as well. It is obvious that if the plan is carried out and full payment made the infants will have the advantage of a six per cent investment. The court is not willing to absolve the executors from liability upon the basis suggested. It will approve the procedure suggested but only as a means of payment. Either the executors may pay the accumulated income in cash or may make provision for payment in the manner suggested by them with the reserved right to the infants to hold the executors personally liable for any failure of payment pursuant to the plan. The court thereby will retain its control over the fiduciary obligation of the executors and can, if need be in the future, enforce the infants' rights to the full. The executors may submit in writing their choice of the procedure to be followed.

The special guardian's fifth, sixth and seventh objections relate to transactions involving W. & W. This company was organized in 1925 to take title to premises 222 West Eighty-third street. The deceased and the executor Samuel Wacht, as sole stockholders, each acquired 100 shares of the capital stock. No change has occurred in stock ownership. The estate interest in the stock of W. & W. was inventoried at $13,863.22. The real property of the corporation was lost by foreclosure of mortgage in 1933. As of January 1, 1934, the estate stock interest was written off as worthless. Under date of March 29, 1926, deceased and Mr. Wacht guaranteed to American Trust Company all moneys then due from W. & W. or thereafter borrowed by that corporation. Another agreement dated January 19, 1927, stated that " the W. & W. Development Corporation * * * borrows money from the American Trust Company at times upon its note either indorsed by the parties hereto or guaranteed by them. It is therefore the understanding and agreement by and between the parties hereto that in the event either of the parties will be called upon to pay any of the said loans, that whatever amount will be required to be paid by any of the parties hereto, same will be contributed equally by and between the parties hereto * * *. This provision shall apply to any extensions or renewals that may be executed in the future." Finally on March 22, 1929, the deceased and Mr. Wacht, after reciting that the corporation was indebted to both of them and that its assets were non-liquid, mutually covenanted as follows: " That the amount of the advances or loans by each of the parties to the corporation shall at all times be equal and each of the parties hereto agrees to lend to said corporation additional equal amounts when and as the financial

condition of said corporation requires further cash to meet its obligations, all of which advances or loans shall bear interest at the rate of 6%." It was further provided that the indebtedness of the corporation should be repaid when convenient, meaning thereby at a time when such repayment would not impair the cash position of the corporation or render it insolvent. Repayments if made were to be on a basis of equality and only upon the " unanimous consent " of the contracting parties. The agreement in terms is binding on the " heirs, executors, administrators and assigns " of the parties.

When deceased died, W. & W. owed American Trust Company $50,000. This debt was subject to the guaranty of 1926 referred to above. The corporation at the same time was heavily indebted to the wife of deceased and to Mrs. Wacht. The obligation in favor of Mrs. Wacht eventually ran in favor of her husband by virtue of an assignment. Bank of Manhattan Trust Company, successor in interest to American Trust Company, shows by its records that as of March 10, 1931, the debt had been decreased to $40,000. On March 31, 1931, Mr. Wacht and Mrs. Witkind (officers of W. & W.) personally executed to the creditor their unconditional guaranty of repayment of all moneys theretofore advanced to the corporation or which might thereafter be borrowed by the corporation. A similar guaranty was made by them on June 20, 1933, at which time W. & W. was still indebted to this creditor to the extent of $32,000. As of this date the current renewal on the original note was due to mature on July 13, 1933. On that date an additional $2,000 was paid on account. Thereafter the obligation was carried by the creditor as a demand note with interest at five per cent. This obligation was finally discharged on or about March 16, 1936, when Mrs. Witkind borrowed $30,000 from National City Bank for that purpose. She received in return the W. & W. note. At about the same time Mr. Wacht delivered a letter to Mrs. Witkind certifying that one-half of this debt was his obligation. The position is taken that the estate is liable with interest for the half held by Mrs. Witkind.

It must be noted parenthetically that the foregoing outline of the transactions with Bank of Manhattan Trust Company should be modified by noting that on November 6, 1931, an additional sum of $15,000 was borrowed and was evidenced by two promissory notes for $7,500 maturing on December 14, 1931, and January 12, 1932, respectively. The first note was paid. The second note was renewed; $5,000 thereof was eventually paid and the balance was consolidated with the outstanding balance due on the original debt.

On this state of facts the special guardian by his sixth objection seeks a ruling that the transactions in respect of the Bank of Manhattan Trust Company are not binding on the estate. His theory is that the death of deceased put an end to his guaranty of repayment of debts of W. & W.; that by the guaranty of 1931 executed by Mrs. Witkind and Mr. Wacht as individuals the estate was released from such liability as it might have had under deceased's guaranty of 1926; that in any event additional borrowings to the extent of $15,000 were unauthorized and not binding on the estate, and finally that during the period in which the loan said by the executors to have been guaranteed by deceased was kept alive, W. & W., the principal debtor, was making payments to reimburse, with interest, the advances made by the executors acting as individuals — this to the detriment of the estate. The executors rely on the 1926 guaranty by deceased of any debt due from W. & W. to this creditor and on the agreement of 1927 making express reference to renewals. The claim is made that all that was done subsequent to death amounted to renewals of the original indebtedness.

Deferring for the moment examination of the legal principles operative in the foregoing situation the relevant facts in relation to objections 5 and 7 should now be stated. In respect of the fifth objection it may be noted that after the death of deceased on September 8, 1931, W. & W. borrowed $35,000 from County Trust Company (now Lawyers Trust Company). The corporation's note was guaranteed by Mrs. Witkind and Mr. Wacht. The proceeds of this loan were applied to payment of installments of principal on mortgage, interest, taxes and maintenance charges on realty owned by W. & W. As of May 24, 1933, this loan had been reduced to $24,500. On that date it was paid off by adding to the $2,000 in the treasury of W. & W. $20,000 raised on a note of Mrs. Witkind and $2,500 advanced to W. & W. by Mr. Wacht. The $20,000 loan effected by Mrs. Witkind has been reduced to $14,000. The $6,000 which was paid off was contributed fifty per cent by Mr. Wacht personally and fifty per cent by the estate. Interest on the loan has been met in the same manner. The objection of the special guardian in relation to this transaction seeks a determination that the estate has no liability for the borrowing by W. & W. subsequent to death of deceased. In effect the executors, to charge the estate with responsibility in connection with the transaction, rely entirely on the content of the equalization agreement of 1929.

As respects the seventh objection the facts are that on the date of deceased's death the corporate debt to Mrs. Witkind and

Mrs. Wacht was the same. Thereafter Mr. Wacht made advances in behalf of W. & W. which exceeded advances made by Mrs. Witkind. The excess amounted to a net sum of $20,238.87. One-half of the amount, or $10,119.43, was considered by the executors to be payable from the estate pursuant, it is said, to the terms of the 1929 " equalization agreement." The special guardian takes the position that these post mortem advances could not bind the estate; that the equalization agreement terminated at death.

The legal import of the foregoing facts may now be stated. At the death of deceased the $50,000 debt of W. & W. was the subject-matter as has been seen of two separate but connected agreements. The 1926 guaranty shows deceased and Mr. Wacht standing as coguarantors binding themselves to answer to the creditor for the debts both present and prospective of W. & W. The 1927 agreement clarifies the sense of the 1926 contract by making it evident that as between themselves they were equally bound by the terms of the guaranty and were subject to the duty to contribute in equal shares whatever expenditures might have to be made.

If the estate of deceased is directly liable for fifty per cent of that portion of this $50,000 debt which was not discharged by the principal debtor it is chiefly by reason of the 1927 contribution agreement. The creditor has been paid off. It was not forced to sue on the guaranty which had been executed for its benefit. The arguments which have been advanced at large by the special guardian to the effect that the guaranty so far as the deceased was concerned terminated at his death or, if not, that his liability as guarantor was terminated by extension of the debt or by its consolidation with a new advance are irrelevant. It might even be that they are in large part unsound in virtue of article 8 of the Debtor and Creditor Law. The beneficiary of the guaranty in any event could have compelled Mr. Wacht to answer for the W. & W. debt. Mr. Wacht, if he paid the debt, could in turn look to contribution of fifty per cent of the amount thus paid relying for reimbursement on the language of the 1927 contribution agreement. The court is not suggesting that in the absence of the 1927 agreement the estate would not be liable to contribute its ratable share of any sums required by the creditor to be paid by Mr. Wacht under the terms of the guaranty. The law is otherwise. (3 Williston on Contracts, 1253.) The point is, however, that the principles of suretyship and the consequences of the death of one of two co-obligors need not now be considered. The relations of Mr. Wacht and deceased so far as contributions *inter sese* are concerned are fully specified by the terms of the 1927 contract.

The estate was, therefore, necessarily responsible for its share of the debt provided the contract of 1927 was not terminated by death of deceased and further provided that W. & W. in the first place was itself unable to meet the obligation in whole or in part. The contract was not terminated by death so far as definite obligations thereunder arose in deceased's lifetime. Its terms import the operation of the agreement over an indefinite span of futurity. That this might exceed the life of either party so far as *definite* contingent obligations arising in the lifetime of deceased were concerned was always clear from the character of the transaction. As to the nature of the contract itself it was in no sense personal so far as these definite contingent obligations were concerned. Such obligations were not terminated at death. Whenever *during the lifetime of deceased* W. & W. contracted a debt payable to American Trust Company the 1927 agreement charged both deceased and Mr. Wacht so as to preserve equality between them should it become necessary for either of them to take up the W. & W. obligation. Property outlives property holders. It must respond to the burdens imposed upon it by the lawful commitments made by its owner during his lifetime. The presumption is not that contracts terminate at death but that they continue to bind the executors or representatives of the deceased party. (*Chamberlain* v. *Dunlop*, 126 N. Y. 45, 52.) Contractual obligations terminating at death are exceptional and not typical and are the outcome of necessity due to the purely personal features present in the contractual relationship. (*Brearton* v. *De Witt*, 252 N. Y. 495, 501.)

But it still remains to be shown whether the estate is truly liable for fifty per cent of that portion of unpaid debt contracted in the lifetime of deceased and due from W. & W. to Bank of Manhattan which was eventually paid by Mr. Wacht, Mrs. Witkind and the estate. That W. & W. did not pay a large portion of its debt is a fact. Whether it could or whether under all the relevant circumstances it should have paid it between 1930 and 1933 (when its realty was lost by foreclosure) remains to be determined. Determination of this question is impossible until a full account be rendered by the executors of the transactions of W. & W. A final ruling on the special guardian's sixth objection cannot be made now.

A wholly different problem exists in relation to the matters questioned by the special guardian in his fifth and seventh objections. As has been already indicated, Mr. Wacht and Mrs. Witkind as individuals loaned substantial sums to W. & W. after the death of deceased. They also borrowed extensively for the benefit

of W. & W. after the death of deceased. To the extent that these advances and borrowings were not repaid by W. & W. the estate of deceased is sought to be charged with a fifty per cent liability. Whether the estate has any responsibility as respects these transactions is to be determined by an interpretation of the 1929 equalization agreement, the content of which has already been shown. That agreement is twofold: *First,* it obliges the " parties " to lend to the corporation " additional equal amounts when and as the financial condition of said corporation requires further cash to meet its obligations." *Second,* it provides that no repayment " shall be made to either of the parties hereto except upon the unanimous consent of the parties hereto." It is urged by the executors that this is a third party beneficiary contract and also that in all events its survivorship of the death of either party was intended. The court holds that though in terms this contract is for the benefit of a third party, namely, the corporation, it is not that kind of a contract on which the corporation as such could have maintained suit. (*Seaver* v. *Ransom,* 224 N. Y. 233.)

Moreover, this contract in its executory features could not survive the death of deceased. The margin of the stockholders' interest in the property of this corporation was always narrow, having in mind the amount of the mortgages, the amortization requirements and the like. The venture was to the utmost degree speculative. How long the parties would determine to pour money into the corporation in order to protect their interests was *a question which both were obliged continuously to re-examine.* From the language used in relation to repayment it is clear that the intention of the parties was to prevent either from exercising an exclusive control of the situation. The authority given by testator to his executors to retain his securities falls far short of permission to bind the estate by lending money to a corporation, the estate interest in which was comparatively small. *Matter of Corbin* (101 App. Div. 25) is distinguishable. From the record on appeal in the cited case it appears that the contract there was an oral arrangement between deceased and one Pratt to maintain the price level on certain stock. The agreement reached to the purchase of a *definite number of shares.* Pratt performed his part and the estate was bound to do likewise. There was no personal element in the contract. Its limits were fixed and certain. In that case moreover the executors were empowered by the will to make and renew loans. Finally there the major assets of the estate were subject to being wiped out unless the price on the stock was pegged The contract in the present instance has a meaning free of doubt. — it could have been intended by the parties to regulate their

obligations only while both continued to live. Its obligations *as fixed in terms of money while deceased lived* would of course be continued after his death. But the contract could not become justification for Mr. Wacht to pour a limitless sum into W. & W. after deceased's death on the assumption that deceased in his lifetime had given *carte blanche* to charge his estate with fifty per cent of all liabilities which might thus arise. "It is now well settled that when performance depends on the continued existence of a given person or thing, and such continued existence was assumed as the basis of the agreement, the death of the person or the destruction of the thing puts an end to the obligation." (*Lorillard* v. *Clyde*, 142 N. Y. 456, 462. See, also, 23 L. R. A. 707; 26 id. 416; 45 L. R. A. [N. S.] 349.) In all cases such as that now being considered "the inquiry," in the words of former Chief Judge CARDOZO, "is merely this, whether the continuance of a special group of circumstances appears from the terms of the contract, interpreted in the setting of the occasion, to have been a tacit or implied presupposition in the minds of the contracting parties, conditioning their belief in a continued obligation." (*Canadian I. A. Co.* v. *Dunbar M. Co.*, 258 N. Y. 194, 198, 199.)

Instituting an inquiry into the circumstances of the contracting parties here and the occasion of their agreement in 1929 the court finds that they did not expect the executory obligations thereof to continue after the death of either. The parties were engaged upon a risky undertaking. They expressly provided that neither could get his money out of W. & W. without the consent of the other. They dealt at arm's length. It was impossible that such dealings should be continued when upon the death of deceased the legal titles of deceased and Mr. Wacht merged in the latter by reason of his status as executor. A true substitute for deceased became impossible. But altogether apart from that fact no substitute was ever intended by the parties to the contract to act for either of them. The contract called for action so peculiarly personal that in the absence of express words to the contrary it necessarily terminated as to its executory features as of the death of deceased. Furthermore no substantial advances to W. & W. can be defended by executors on the theory that such advances were a proper exercise of discretion in the hope of protecting the value of the estate's stock interest in the corporation. That interest was always too small and too precarious to justify any such risk on the part of fiduciaries. Accordingly objections 5 and 7 are sustained.

By reason of these rulings it follows that when a final ruling is made on the sixth objection it will include the disallowance of any claim to recover from the estate that amount ($2,500) of the

new borrowings of Mr. Wacht and Mrs. Witkind which was consolidated with the indebtedness outstanding at the date of deceased's death.

Had the court been led to an opposite view of the 1929 agreement, it is interesting to note that it would have been impossible to determine the rights and obligations of the estate due to the absence from the records before it of a complete account of the transactions of W. & W. from the date of deceased's death until these advances and borrowings had been concluded.

A final observation on these objections is necessitated by the state of the record. The court has ruled tentatively that the estate is liable for fifty per cent of the obligation of W. & W. to American Trust Company. It appears that this debt was brought down from $50,000 to $30,000 by payments directly made by W. & W. It does not appear from the record whether the money borrowed by W. & W. subsequent to the death of deceased or the personal advances made to W. & W. by Mr. Wacht and Mrs. Witkind (in respect of which the estate has no liability) were used in part to reduce the obligation of W. & W. due American Trust Company. If moneys made available by the credit or by the advances of the executors were applied to that purpose, the executors can properly claim credit to the extent of such application of the new funds, and the liability of the estate in respect of the original debt to American Trust Company will be correspondingly enlarged to reach a figure somewhere between its established minimum figure of $15,000 and its possible maximum figure of $25,000. Here again it should be noted is a further reason making it imperative that an account of the transactions of W. & W. should be made available in this proceeding.

The eighth and ninth objections raise issues respecting the allowance of commissions. The court is satisfied with the good faith generally of the executors and on the basis of the information now in hand will allow commissions to them. In view of the surcharge herein directed the commissions allowed must first be applied to the satisfaction of the surcharges and if necessary will be wholly appropriated to that purpose. So far as the ninth objection deals with the allowance of commissions on realized increases in capital account it must be overruled. The fact that there have been net decreases in that account does not bar commissions on actually realized increases. The point has hitherto been passed on by this court. (*Matter of Wallace*, N. Y. L. J. Aug. 10, 1937, p. 360.)

Other questions relating to commissions are raised which require more extended comment. Notice was taken earlier in this decision of the fact that the charges both for salaries and for agents' col-

lection charges on rents in the case of the properties of Sagobel and its subsidiary amounted to less than five per cent of the gross rents. The facts presented by this record exhibit another of the inequitable and in a sense, startling results of the rule first judicially declared in *Matter of Swartz* (162 Misc. 46). Comment on various aspects of the application of this rule have been made by this court in *Matter of Kight* (167 Misc. 296); *Matter of Mohr* (Id. 523), and *Matter of Bates* (Id. 641). Here we have exhibited the utterly indefensible business aspect of the rule. Here the special guardian complains of excessive charges for the management of realty by the trustees-executors through a corporate form though the charges as noted do not even amount to five per cent on the gross rents collected. The court agrees that it is obliged to examine the conduct of fiduciaries who own the stock of a corporation which in turn owns real property and that the court is required to see whether or not they have performed their duties in respect of the corporation. When the fiduciary operates through a corporation the question is not whether the total charges are five per cent of the gross but rather whether the charges exceed the reasonable cost of the service as determined in the market place. And so the situation might well be presented in the same estate adminis-tration of fiduciaries who would be subject to surcharge if they permitted a corporation owning real property to pay more than the market cost of rent collection service while themselves charging double and triple the market cost in the case of rent collections on property which deceased owned in his individual name and put into the trust. As officers of the corporation the fiduciaries are obliged to seek service at the market price. If they pay more than the market price and thereby diminish the income they will be sur-charged for the loss, on proper objection. As was said in *Matter of Byrnes* (159 Misc. 302) the corporate fiduciary there accounting presented in its brief the rates currently charged by members of the Real Estate Board of New York and established that (excluding brokerage commissions) the rent collection charge on large prop-erties such as are involved in the Sagobel ownership would not exceed three per cent of the gross. If these same properties had been in the individual ownership of deceased the inequitable rule declared in *Matter of Swartz* would permit a five per cent collection charge on gross and then (since there are two executors) an additional four per cent on the gross. In other words, the mere accident of ownership in corporate form may require the court to hold fiduciaries to one-third of the cost which the onerous rule in *Matter of Swartz* would permit them to take in the case of individually owned realty. While in the case of the corporate form there would be

some additional compensation to the fiduciary in the way of commissions on dividends declared it should not escape attention here that Sogobel has declared no dividends and has been devoting all of its net rents to the extinguishment of its debts. Here, too, is an illustration of the inequities of the *Swartz* rule. The executors would be surchargeable if they undertook to leave the corporate debts unpaid and to appropriate the net rents to dividends so they could get commissions. If the same debts were owed by the individual and the realty likewise owned by him, the *Swartz* rule would give the executors nine per cent commissions on the gross rents whether the balance (if any) was devoted to the payment of the debts or not.

These illustrations of the working of the rule in *Matter of Swartz* emphasize the need of the distinctions which this court has made in the instances hereinabove referred to. That such distinctions are justifiable is evident from the language of the Court of Appeals in *Matter of Johnson* (170 N. Y. 139, 143, 144): " A statute should be construed, sometimes literally and sometimes liberally, but always reasonably. If there is no reason for reading the statute otherwise than literally, that should be done, but if, under all the circumstances, a liberal construction is the more reasonable, that should be adopted. The practical working of a statute has an important bearing, ' for the Legislature is presumed to have intended to do justice, unless its language compels the opposite conclusion.' * * * That [*i. e.*, multiple commissions] would be a heavier burden than the spirit of the statute permits, for it would rest upon an accident and not upon the risk and anxiety of caring for a large estate. * * * These illustrations, which might be multiplied, show that the construction contended for is unreasonable." Thus the rule of reason compels the constriction of the *Swartz* rule into limits as narrow as are permissible within the controlling authority of *Matter of Schinasi* (277 N. Y. 252).

Notice was taken in *Matter of Mohr* of the fact that the supposed universal and State-wide practice to charge on gross rents has never been proved because never litigated in *Matter of Schinasi*. Inspection of the file in *Matter of Swartz* discloses that it was neither litigated nor proved in that proceeding. Indeed in *Matter of Swartz* there was no issue at all and so the opinion in *Matter of Swartz* is entirely *obiter dictum* — no controversy of any sort being before the court in that proceeding. The majority in the Court of Appeals appears to have relied upon the fact statements in the *obiter dictum* in *Matter of Swartz*. Thus the unrepresented multitude of beneficiaries for whom trusts supposedly are administered have never had an opportunity to be heard on this question which

has affected their interests so vitally. It is not without significance perhaps that the *amici curiæ* and the accounting corporate executor in the *Schinasi* record (Bank of New York and Trust Company, Central Hanover Bank and Trust Company, Chase National Bank, City Bank Farmers Trust Company, Irving Trust Company and Chemical Bank and Trust Company) represent only a fraction (though a substantial one) of the total number of corporate fiduciaries authorized to serve in this State. It may be that the failure of the much larger fraction of corporate fiduciaries to co-operate of record with these " *amici* " was due in some degree to the knowledge possessed by their respective officers that in their own respective managements of trusts no such practice is followed as was asserted in *Matter of Swartz*. If examined in a hearing where the question can be litigated, perhaps the records filed by some of the " *amici* " would develop departure from the practice whose existence they asserted in the appellate courts. It may be, too, that the substantial fraction of the corporate fiduciaries which did not join in the *Schinasi* proceeding as " *amici* " were unwilling to contend for a rule so onerous and so unjust to their beneficiaries.

As was noted earlier in this opinion the proof on the hearing developed that the Sagobel rents for the period accounted for aggregated $1,837,482.74. On this total of rents the *corporation* paid for rent collections only $45,930.08 in commissions. Had these same properties been owned wholly by deceased *individually* and had the same rents been collected the five per cent management fee would have amounted to $91,874.12 — a little more than double the actual payment by the corporation. Under the *Swartz-Schinasi* rule (again assuming individual ownership) there would be deductible an additional four per cent on the gross or $73,499.31. (Brokerage charges are ignored in these calculations; though they add an appreciable burden under the *Swartz-Schinasi* rule). Thus this same body of rents would have been subjected by these two executors to total commissions on gross aggregating $165,373.45. If there had been three fiduciaries instead of two the total would have increased to $203,123.10. Thus is exhibited the difference between " the morals of the market place " (*Meinhard* v. *Salmon*, 249 N. Y. 458, 464) and the *Swartz-Schinasi* rule. The rule inverts the fiduciary standard declared in the cited case.

Three of the corporation's officers and directors (two of these being the executors) were paid salaries aggregating $43,549.97. It would be a violent assumption to suppose that these payments were solely for collecting rents and had no relation to other corporate business but if that assumption were indulged it still would be the case that the spread between the burden of the *Swartz-*

*Schinasi* rule and the cost of ordinary business management of the realty by this corporation is so wide as to challenge attention. The executors defend their takings of salaries from the corporation on reasons unconnected in the main with rent collections as such. What the court should do in fairness to the executors in relation to these salaries and other costs of collections which are challenged by the special guardian can be determined only when the full report of the transaction of Sagobel and Armin is made as directed herein and only after consideration of the conduct of the executors in the light of that more complete information.

The ninth objection further questions the computation of commissions on the amounts which have actually been paid out in discharge of the W. & W. obligations. To some extent these payments have been definitely ruled upon. Hereafter when the accounts of W. & W. have been examined a comprehensive ruling will be made. In so far as commissions are claimed on borrowing effected subsequent to the death of deceased they necessarily will be disallowed in conformity with the ruling already made respecting such borrowings. If any other payments and charges are held to be improper, commissions thereon will be disallowed. Commissions may be computed of course on the capital as reconstituted by payment of all surcharges. It is also asserted that certain commissions are not to be computed now but should await an accounting by the trustees as such. Commissions in only one capacity are being sought by the accounting parties. The present proceeding is in substance a final executorial and an intermediate trustee accounting. The claim for commissions, therefore, is not open to criticism so far as objection thereto proceeds on the unfounded assumption that the accounting parties are seeking commissions either in two capacities or prematurely.

The tenth objection is definitely dismissed except with reference to advances made to Sagobel. These advances have been repaid except that certain items of interest on the Sagobel indebtedness to the estate have been reloaned to the corporation. These transactions served to increase the capital indebtedness of the corporation to the estate. These advances may have been a prudent exercise by executors of their discretionary powers and may have been necessary to protect the estate interest in this asset. Whether such is the fact is not determinable in the absence of full accounts of Sagobel's transactions from the date of death to the time when the advances were made.

In his eleventh objection the special guardian objects to a payment of $7,500 made to Joseph G. Cohen on July 10, 1931, for legal services rendered the estate. The ground of this objection is that

" at that time Joseph G. Cohen was indebted to the estate in the sum of $6,114.43." The payment to Cohen is said to have caused a loss due to the " depletion of the cash position of the trust estate by such payments requiring the liquidation of securities at a loss in order to meet current obligations in that period." This objection must be overruled. No securities had to be liquidated to make this payment. It took place in an interval when the last prior sale of securities was ten months old and the next sale of securities was still fourteen months in the future. No loss resulted to the estate. If it had been shown that the payment made to Mr. Cohen resulted in a loss of liquid capital resources making it impossible for the estate to take up the estate tax obligation on which six per cent penalties were accruing then damage would have been established. No such showing was made. On the contrary, the proof reveals that the $7,500 was immediately redeposited to the estate account in partial liquidation of an obligation of Mr. Cohen arising out of the Witkind & Co. debt to the estate. Moreover, the failure of Mr. Cohen to meet this obligation from his own resources has caused no damage since eventually he paid his debt in full at an interest rate, the deficiency in which is to be rectified in accordance with a ruling already made.

The twelfth and last objection in part has been withdrawn. So far as it asks a direction requiring that accounts be rendered for the transactions of W. & W. it has been ruled upon favorably. There remains for consideration that portion of this objection which concerns the retention by executors of deceased's securities. The will authorized retention of and new investment in non-legal securities. The special guardian contends that in exercising their power to retain securities the executors behaved imprudently and were actuated by considerations of personal advantage. The facts proved at the hearing show that deceased in his lifetime carried a large secured loan with American Trust Company. His indebtedness reached its peak in October, 1929, when it stood at $193,500. On the date of his death, in addition to a separate debt of $37,500 in favor of this creditor, deceased owed it $105,000 secured by marketable collateral valued at about $190,000. The loans bore five per cent interest. The total security holdings of deceased at the date of death were worth $260,129.95. This sum represented about fifty per cent of the gross estate. The executors qualified on April 10, 1930. On the eleventh and seventeenth of April $7,500 and $45,000, respectively, were paid to the creditor. Five days later securities were sold for the first time and an additional $12,500 was applied to the reduction of the debt. On the twenty-fifth of April $7,500 more was paid. The balance

of the whole debt remaining unpaid then stood at $70,000. On May 20, 1930, $5,000 was paid on account. Other installments were paid as follows: $5,000 on September 9, 1930, $10,000 on September 20, 1930, and $2,500 on October 22, 1930. Within six months of the grant of letters, therefore, $95,000 of the original debt of $142,500 had been paid. Later payments were made as follows: On December 1, 1931, $3,000; on September 22, 1932, $14,500; on June 14, 1934, $1,500; on July 14, 1934, $13,000; on July 22, 1934, $11,000, and a final payment was made on April 29, 1935, of $4,500. The debt was on a time loan basis until July, 1930. Thereafter it was a demand loan.

The argument of the special guardian comes to this: the executors speculated with the deceased's holdings by failing to liquidate the loan promptly and eventually they were under the necessity of making forced sales which caused substantial losses to the estate. He draws attention to the loans in 1930 and 1931 aggregating about $19,000 which were made to Sagobel; to a loan of $10,000 extended to W. & W. in 1932; to the receipt between September, 1931, and September, 1932, of twelve margin calls on balance outstanding on the debt to the trust company; to the continued failure of the executors to collect the full amount due the estate from Witkind & Co.; to the payment by the executors to themselves and to the attorney of the estate during the early period of administration of salaries from Sagobel exceeding $40,000; to the payment to the widow in the first seven months of administration of $26,252.58. These and similar facts are correlated by the special guardian to reach the conclusion that the executors did not consider first things first. They should, he contends, first have reduced all outstanding assets of the estate to possession. Then they should have paid taxes and debts. The outcome of their failures in these particulars caused the estate to suffer damages which he has estimated on three alternative bases, the details of which may be omitted for the moment.

The executors in answer defend their conduct in making loans to Sagobel by showing that these consisted essentially of interest installments paid to the estate and returned to the corporation to protect its position under trying circumstances. They point out that the margin calls were answered in part by pledge of the personal holdings of the executrix Mrs. Witkind in order to protect the pledged securities of the estate. Explanation of the salaries paid by Sagobel has already been described elsewhere in this opinion. Payments to the widow they have shown were in accordance with and fell short of a full exercise of her rights under the will. Finally

testimony was given to negative the contention that securities were sold *in invitum* at any time during the period covered by the accounting. The testimony of Mr. Wacht established beyond any doubt that throughout the period covered by the account the most anxious attention was given to business conditions affecting and to opinions of "experts" respecting security values. Whatever a prudent man would have done in guarding against losses arising from inattention and carelessness was done by the executors here. Had not the debts of deceased demanded action the court would be bound to exonerate the accounting parties from all blame attendant upon their holding of the securities. (*Matter of Clark*, 257 N. Y. 132.)

The fact is, however, that the executors received not merely blocks of securities which they might hold or sell as they determined provided they were prudent in so acting but they became charged as fiduciaries with a large debt which on July 7, 1930, became due. By reason of the coexistence of securities and the debt to which they were subordinated it is strictly accurate to say that all the executors got was a right to redeem the securities pledged for discharge of the debt. What should the executors have done? They argue that their primary problem was to determine whether to hold or sell securities. This is an error not of judgment but of law. The law is that "every executor and administrator must proceed with diligence to pay the debts of the deceased." (Surr. Ct. Act, § 212.) The law contemplates that if an executor or administrator does not show diligence in the discharge of a debt of the deceased the creditor may institute proceedings to compel payment. (Surr. Ct. Act, § 217.) The law supposes that an executor will ascertain and pay debts first. This is elementary. These executors had express direction from the testator respecting their duty. The testator said: "*First*, I direct that all my just debts and funeral expenses be paid out of my estate just as soon after my decease as may be convenient." Thus the will to which they refer for their authority to hold investments is found to be in contradiction of their position since the privilege to hold was subject to the duty to pay debts.

As of the date of death of this deceased the law gave to executors and administrators a one-year period within which to collect assets and pay debts and legacies. After that date interest was collectible on legacies. After that date creditors and others interested could compel an account. Here, as has already been stated, the executors in real fact received only the equity in the account. Only on that equity were they entitled to collect commissions. (*Matter of Mills*, 149 Misc. 389, affd., 239 App. Div. 817; affd., 263 N. Y. 574.)

The large amount of the debt and the large risks involved in carrying on what appears to have been a speculative account of deceased should have determined the executors to liquidate the account promptly. They should have been moved so to act upon considering that the claims of creditors have preference over claims of legatees (*Hogan* v. *Kavanaugh*, 138 N. Y. 417, 422) and in virtue of the fact that not even the testator could have deferred the rights of his creditors to those of his legatees. (*Matter of Chave*, 227 App. Div. 554.) In any event the account should have been fully closed by the end of a normal administration period, one year after the date letters were issued. In choosing this date to fix the liability of the executors the court has given full and perhaps undue weight to all the elements which have been urged in exoneration of the accounting parties. The duty which rested upon them has been stated by the Appellate Division of this Department in *Matter of Hirsch* (116 App. Div. 367; affd., 188 N. Y. 584). There the court in dealing with a similar situation exonerated the executors from any charge of bad faith and credited them with possession of a sincere desire to do the best they could for the beneficiaries. Nevertheless the court said (p. 376): " That the original purchase of these stocks by the testator was a pure speculation and not an investment is perfectly clear, and its continuance by the executors and trustees by supplying additional margin for the purpose of carrying the stocks was a continuance of that speculation and in no sense an investment. I can come to no other conclusion than that the action of the trustees in devoting the property of the trust estate to a continuance of this speculation was unauthorized either by the law in relation to the administration of trust estates or by the will and codicil of the testator. And the good faith of the appellant in advising this course cannot excuse him when called to account for his administration of the trust." While the objective of the proceeding in the cited case was only the removal of the trustee the opinion states the rule applicable to a situation such as is here presented.

Passing for the moment the consideration of the amount which should be surcharged to the executors, note should be taken of the general rule which in any event imposes upon them liability for the excess interest paid upon the debt. As was said in *Matter of Goetschius* (2 Misc. 278, 284): " The executors had moneys in their hands out of which the note should have been paid and discharged within a reasonable time after they entered upon their administration of the estate, and they could not legally fail so to do and charge the estate with the accruing interest for the long period of time that has since elapsed." In *Willcox* v. *Smith*

(26 Barb. 316, 336) it is said: " No sufficient excuse was shown before the auditor or surrogate, why the note Snow held against the deceased was not fully paid by the administrator and administratrix, within eighteen months from the time of their appointment. They had abundant means in their hands for paying it; and they should have been charged personally, by the surrogate, with all interest that accrued on it after the expiration of the eighteen months above mentioned; or with interest from that date on the sum then due on the note. (Dayton's Surrogate [2d ed.], 480.) " In effect the same rule is declared in *Kingsland* v. *Murray* (133 N. Y. 170, 174, 175) where the court dealt with the right of resort to real property for the payment of debts. It is there held that the duty rests upon the executor to pay the debts out of the personalty and that if the personalty at the time of death is sufficient the realty cannot be resorted to even though waste of the personalty renders the fund insufficient. Surcharge for the *devastavit* of the estate at least to the extent of the interest accruing after the debt should have been paid is the minimum chargeable to the executors. (*Matter of Hawley*, 108 App. Div. 185; affd., 185 N. Y. 566; Williams on Executors [10th ed.], p. 1442; *Willcox v. Smith*, *supra; Matter of Goetschius, supra;* Dayton, *supra.*)

The special guardian argues that the executors are chargeable with a much heavier burden. He suggests three methods of fixing liability. The *first* is a computation of damage to the estate by assuming that the pledged securities were the sole source of payment of the debt and by assuming payment by resort to such securities. He adds to these assumptions the suggestion that the shrinkage in value between the prices at which the pledged securities could have been liquidated and the prices at which they were in fact sold measures the damage. This he computes at more than $80,000. *Second*, he suggests that the difference between the selling prices which the pledged collateral could have brought had the shares been sold at the dates when payments were made on account of the indebtedness and the actual proceeds of so much of it as was sold is the measure plus a further sum representing the shrinkage in value of the unsold collateral after dates when payments on account of the debt were actually made. Of this theory he reaches a total surcharge claim of over $64,000. *Third*, he suggests that the executors were not entitled to devote any of what he calls the " free " assets of the estate to the reduction of the loan. He asks that they be surcharged with the total of the " free " assets so used or $57,000. The court is not in agreement with any of the three theories advanced by the special guardian.

Considering the last theory of the special guardian first the court cannot say that there is any rule of administration which forbids an executor to redeem collateral by the use of other assets in his hands. Occasions may well arise where the redemption of the collateral would be held to be a sound exercise of discretion. The mere use of other assets should not itself be made the basis for surcharge. The court will not here substitute its own business judgment (formulated after the fact) for the judgment exercised in undoubted good faith by the executors when the problem was presented to them. Accordingly the third suggestion of the special guardian as to the rule of damage is held to be without substance.

While the court does not agree with the other two suggestions of the special guardian it is nevertheless of opinion that the factual situation presented on this record does not warrant a limitation of the surcharge to reimbursement to the estate of the unnecessary interest payments which under the cited authorities were clearly a *devastavit* of this estate. The general rule furnishes complete restitution to the estate in a situation where the assets are of stable value. If the delay in payment is accompanied by no shrinkage in the capital value of the fund out of which payment is eventually to be made it is clear that the only damage caused by the delay in payment is the excess and unnecessary interest. The objective in every instance is to repair the *devastavit*. The executor is not deemed himself to owe the debt. He is not held to the duty to pay the interest because of any such status. He is required to make whole the estate which was in his management for the damage directly traceable to his neglect. Whatever considerations operate to his advantage should be weighed by the court with every consideration requiring attention in order to protect the beneficiaries. Here the estate suffered direct loss of capital values which are traceable directly to the mismanagement of the executors. Some measures of restitution must be required if the beneficiaries are truly to be made whole.

The surcharge here must consist of two elements. Credit for interest payments made on the debt after April 10, 1931, is denied in accordance with the authorities already cited. The executors are required to make whole the estate for these charges paid for the period beginning April 10, 1931. Since the affairs of this estate and the values of the securities in it were not stable the *devastavit* is not completely cured by the mere reimbursements to the estate of the disallowed interest payments. The faulty management by the executors resulted in a capital damage which they must repair.

Looking at the situation from the viewpoint of the estate values on April 10, 1931, when payment of $47,500 was necessary, we must

know with what assets the payment should then have been made. In this accounting the executors have consistently shown that they regarded the cash of the estate as a means for making payments which they preferred over debt payments. The account discloses that the executors rarely had any substantial cash balance and so by reason of this latter fact and by reason of the executors' own handling of cash the appropriation to the debt of any cash on hand is excluded. For obvious business reasons the appropriation to the payment of the debt of any but the securities enumerated in paragraph 32 of the stipulation of facts was impossible. The bank for instance would not have taken in payment an assignment of the Sagobel indebtedness. Neither would it have taken in payment a transfer of the capital stock of W. & W. All that was available in a business sense for payment of the debt on April 10, 1931, were the securities themselves, pledged and unpledged. The court cannot determine now what securities would have been chosen by the executors for the purpose had they paid the debt on April 10, 1931. All that the court can do now is to say that the entire body of securities on April 10, 1931, constituted the fund out of which the debt should have been paid. Because the executors were at fault in not having paid they are held by the court to have in effect (and until the debt was paid) pegged the April 10, 1931, value of the securities. In this way they will have repaired the damage to the trust estate and will have corrected their error.

The practical computation of the surcharge is not difficult. The entire body of securities is deemed to be pegged at the April 10, 1931, price. Each item of such securities is deemed to be charged with a specific lien for account of the debt payments. The entire sales proceeds of each security sold after April 10, 1931, are deemed to be appropriated to extinguishment of the debt. Each sale made at a price lower than the April 10, 1931, price of that security is deemed to be supplemented by a surcharge which would bring the sales proceeds up to the level that they would have reached had the security sold been sold on April 10, 1931. Pursuing this plan through each sale made after April 10, 1931, the fund deemed to be appropriated to the debt payment will be comprised of the sales proceeds in each case and the supplementary surcharge in each case until an aggregate of $47,500 is deemed in hand. When that point is reached the debt is deemed to have been extinguished. The balance of securities still remaining on hand after this process is complete is of course deemed relieved of the lien for payment of the debt and again becomes subject to the rule of

law which under the text of this will relieve the executors from responsibility for further declines in value. (*Matter of Clark, supra.*)

During the period from April 10, 1931, down to the date of the sale of the last security whose sale completed the fund for the payment of the debt there will be found to have accrued some income on the securities thus appropriated. Since the executors have been held to the April 10, 1931, price and since they have been refused credit for the interest payments on the debt made after that date they are entitled to an offset represented by the income on the securities whose sale proceeds are thus credited to the debt payments. The rule here stated appropriates the proceeds of the securities *first* sold after April 10, 1931, to the extent necessary to extinguish the *whole* debt. The court disregards the actual uses to which the proceeds of certain sales were put just as the court has disregarded the failure of the executors to sell within the first year of administration and to extinguish the debt within that period. The simple rule of liability which is here set down gives full recognition to the privilege to hold securities which is granted in the will. That privilege is subordinate to the obligation to pay the debts and is so treated in applying the rule. If the court were to venture into the fields suggested by the special guardian's computations the burden on the executors would be enormously increased but the court would not be able to feel that sense of assurance that the rule applied dealt fairly both with the estate and the executors. Dealing with the problem as one which charged the executors with the fixed April 10, 1931, price and adopting the executors' choice in the order of sales the estate will be found to have had the benefit of the April 10, 1931, price and the executors will have been charged with a burden concerning which they cannot complain.

The parties are directed to submit with or before the presentation of the decree a computation of the surcharge on the basis herein stated. If there shall be disagreement between them the court will resolve the controversy on the settlement of the decree. Since the rulings here made will require further steps in the pending proceeding and since it may be desired by some of the parties to fix their rights and liabilities so far as may be at this time, the court will entertain an application for the entry of an interim decree. Unless such course is sought by one of the parties no decree will be entered at this time but an order will be made directing the filing by the executors within twenty days of the additional accounts of Sagobel, Armin and W. & W. which are herein directed. Note is made of a comment by the special guardian on a phase of the account already filed for Witkind Estates, Inc. The executors

have not dealt with that comment fully. The comment is not included in the formal objections of the special guardian. The court will not pass upon the item until after all of the accounts of the respective corporations are before the court. The special guardian will have leave to file additional objections within ten days after the accounts of the corporations are filed and may at that time if he chooses define his objections in relation to the account filed for Witkind Estates, Inc.

Proceed accordingly.