In the Matter of the Estate of JOHN K. TAYLOR, Deceased.
SARAH W. TAYLOR et al., Appellants; DONALD K. TAYLOR, Individually and as Executor of JOHN K. TAYLOR, Deceased, et al.,
Respondents.

First Department, June 30, 1953.

*Edith A. Glennon* of counsel (*Jerome I. Hyman,* attorney for Elspeth M. Furey; *Edith A. Glennon,* attorney for Sarah W. Taylor), for appellants.

*Harold H. Corbin* of counsel (*Francis B. Delehanty, Jr.,* with him on the brief; *Corbin, Bennett & Delehanty,* attorneys), for Donald K. Taylor, as executor, respondent.

*Laurence D. Kieran* for James E. Murphy, respondent.

*David M. Potts* of counsel (*Kadel, Wilson & Potts,* attorneys), for Donald K. Taylor, individually, and another, respondents.

*Harold O. N. Frankel* and *Frank M. Foley* for John K. Taylor, Jr., and others, infants, respondents.

BREITEL, J. This is a proceeding in Surrogate's Court for advice and instruction (Surrogate's Ct. Act, § 215). The widow of decedent and a sister of decedent appeal from a decree approving a proposed sale of the three-quarter interest of the estate in a parcel of real property located on 1st Avenue in the borough of Manhattan, adjacent to the site of the United Nations buildings.

John Kenneth Taylor, decedent, and James E. Murphy were close friends. In 1946 Taylor and Murphy purchased the property in question, improved with six tenements. Taylor contributed 75% of the price and Murphy 25% of the price. They signed an agreement, dated and acknowledged August 21, 1946. It recited the contributions to the purchase price and made a number of provisions to cover their tenancy in common, including one for arbitration. It contained the following two paragraphs, and it is upon these pargraphs that the issues in this case turn:

" FIRST: That the net profits, if any, from the operation and sale of said premises shall be divided by the First Party receiving 75 per cent thereof and the Second Party receiving 25 per

cent thereof, and the losses, if any, from operation or sale of the said premises shall likewise be divided in the same proportion.

" SECOND: In the event of death of either party the survivor shall have the sole right to determine when and if and the terms under which said premises above-mentioned or any part thereof shall be sold, mortgaged, re-financed, leased, improved, altered, razed or encumbered in any manner with the same force and effect as if he were the sole and exclusive owner of the said premises."

The first party was Taylor, and the second party was Murphy. It is evident that the provision as to the survivor was designed to give either Taylor or Murphy, whoever survived, untrammeled power to handle the property and its disposition, if any. But it was conceded on argument, and properly so, that the power conferred was one to be exercised on behalf of the entire joint venture, and consequently, it did not divest the ownership or interest of the deceased joint-venturer in whole or in part. It is also evident that the survivor provision contemplated that the survivor would be dealing with the estate of the deceased joint-venturer.

Taylor died June 18, 1949. His estate has liquid assets of about $180,000. The property on 1st Avenue was purchased for about $225,000, of which about $125,000 was a purchase money mortgage. The city condemned a portion and paid about $190,000. This sum was used first to eliminate the mortgage. As a result of the award the net investment cost to the joint venturers was $88,045.42. The remaining property is worth at least $330,000, the appellants claiming, however, that it is worth at least $400,000. With reference to all of these figures, Taylor's estate is entitled, under the 1946 agreement, to a 75% interest.

The estate needs funds. Trusts for the widow and her young child should be set up promptly. There are debts and administrative expenses. The tenements on the property are in miserable shape; they are dangerous; all but one are unoccupied, and that one should be vacated. The property is an expense to the tenants in common, and there is no net return to them.

Shortly after Taylor died, Murphy made it clear that he did not believe the property should be sold. He said, and reasonably too, that the property would enhance in value. It was clear that its adjacency to the United Nations development, and the inevitable improvement of 1st Avenue, could only result in a speculative profit to the owners, if they would hold on. Exercising his rights and his power under the 1946 agreement, he would not sell.

But the estate was in no position to sit out a speculation. Murphy could see that. He agreed that the estate could sell its 75% interest, subject to the 1946 agreement, and he would deal with any purchaser as he would with the estate. After an extended effort, no purchaser could be found for the 75% interest, divorced of all control, and subject to the untrammeled power of Murphy under the 1946 agreement.

Murphy is still unwilling to sell. He was certain that the value would rise to $500,000, and at that point he would sell. He listed the property for sale at that price, but there were no buyers. The time to sell, in Murphy's judgment, had not yet arrived.

, At this point, one McCormick, a broker associated with John J. Reynolds, Inc., a real estate brokerage firm, proceeded to solve the impasse that afflicted this jointly owned property. Whether he acted at the instance of the executor of the estate or of Murphy, depends on whose version one accepts. Clear it is that what he did was never concealed from the view of all interested parties, so that a claim for fraud by stealth has not been made out. McCormick arranged for a dummy corporation to be organized, Mendee Realty Corporation. Because Mendee did not have enough cash, it was arranged for it to take an option from Murphy for his 25% interest. The option could be taken up at $135,000. This was the price of Murphy's share which he believed his speculative judgment would obtain for him, if he held on long enough. The option was carried in a ten-year lease. Mendee agreed to pay the estate $180,000 for its 75% interest. This would result in Murphy getting 43% of the proceeds of the sale of the property rather than 25%. The estate would receive 57% rather than 75% as contemplated by the 1946 agreement.

The next thing McCormick did was to approach one Lubin, an owner of adjacent property. Lubin agreed to buy the entire property for $330,000. This was $15,000 more than Mendee was to pay for the property. It is argued that the $15,000 was brokerage. Whatever it was — in this proceeding before the Surrogate, Mendee yielded up the $15,000 and agreed that it be allocated to the estate's share. Thus, the new division would be on a basis of $195,000, or 59%, for the estate and $135,000, or 41%, for Murphy.

The question is: Should this proposed arrangement be approved?

Murphy, the executor, a son of decedent, in his individual as well as in his official capacity, a daughter of decedent, and the Special Guardians urge affirmance of the decree of the Surrogate approving the proposed sale. As indicated earlier, the widow and a sister of decedent resist the approval. The widow is the second wife of decedent.

Those who urge approval argue that Murphy's power to sell, being untrammeled, could be exercised or withheld from exercise in his sole judgment based upon his honest evaluation of the opportunities for speculative profit. That, they say, was the intention of the 1946 agreement, and within the power of adult responsible contracting parties. They say that it is within Murphy's right, moral as well as legal, provided he make complete disclosure, to exact a price, or the equivalent of a price, for exercising his power sooner than he otherwise would. Indeed, say they, all Murphy seeks is to restore to himself the loss he would otherwise suffer, were he to exercise the power of sale now, when he deems it less advantageous than it would be if he were permitted as he wishes to bide his speculative time. Moreover, it is argued, if this sale be not approved, what will the estate do? It needs the cash, it needs to liquidate its assets and set up the trusts for the objecting widow and her infant child, and prudence dictates that it rid itself, as soon as possible, of an asset that is an expense rather than a source of income.

The widow and the sister of decedent argue that the effect of the proposed arrangement is to perpetrate a breach of trust; that Murphy by reason of his self-interest in the transaction is empowered to benefit himself in a greater degree than permitted by the 1946 agreement. They suggest that the arrangment proposed is the result of a " conspiracy ", and that the property is being sold at less than its value. They argue that Murphy is using his untrammeled power as survivor under the 1946 agreement to exact a price, not authorized or contemplated by his deceased friend and coadventurer, in order to exercise the power. This he can do because the estate is deemed to be in a position of distress and impotency with relation to the property.

We believe that the proposed arrangement may not be approved. We believe that it is not good, morally or legally. In saying this we emphasize that the proof does not establish any conspiracy or nondisclosure by Murphy. We believe that he thought he was within his legal rights, as, indeed, the learned Surrogate agreed. Moreover, we also believe that the Surrogate was justified in finding that the value of the entire property

was sufficiently approximate to the price to be paid for the entire property by the ultimate purchaser.

What we find impossible to accept is an arrangement whereby the survivor under the 1946 agreement ends up with 41% of the proceeds of sale rather than 25% as contemplated by that agreement. It is not sufficient to say that Murphy has a " right " to withhold exercise of his power of sale, and that therefore he may profit from extending such exercise.

With respect to the price to the estate for its 75% interest in the property, it is argued that it is fair, and " better than fair ". If that be so, then the price to Murphy for his interest is " more than fair ", and even more than " better than fair ". That price, we suggest, is too much.

As noted earlier, it is conceded, as it must be, that Murphy's power to sell was a power to be exercised not only on behalf of himself, but on behalf of the estate of the deceased coadventurer. As such it was not a naked contractual power. It was a power in trust (Real Property Law, art. 5, §§ 131, 137; Restatement, Property, ch. 25, special note to § 320; 3 Powell on Real Property, par. 386, note 26; 5 Amer. Law of Property, § 23.12; *Stanley* v. *Payne,* 65 Misc. 77 [POUND, J.]; *Matter of Brooklyn Trust Co.* [*A. N. Constr. Corp.*], 163 Misc. 117, 127; *Petrossi Bros. Contracting Corp.* v. *Town of Greece,* 29 N. Y. S. 2d 305, 309 [VAN VOORHIS, J.]). If, indeed, it be argued that it is not literally a power in trust as defined by the statutes, it cannot be gainsaid that it is a power, coupled with an interest, to be exercised in part for the benefit of another. That suggests that it is, at least in part, the power of a fiduciary. As such, it may not be exercised under circumstances that violate the purpose of the power or to the detriment, or possible detriment, of the beneficiary. That is so as a matter of morals, and we submit that it is so as a matter of law.

The purpose of the 1946 agreement was to accomplish under all circumstances a 75%–25% division of the proceeds of any sale of the property. That purpose was made explicit in paragraph " FIRST " of the agreement. The power conferred upon the survivor is limited by that purpose. The donor of that power, Taylor, is dead. Consequently, there is no one in being with authority to waive the provisions of the 1946 agreement insofar as they set up beneficial rights in third parties. Murphy may be free to exercise his power, or to withhold exercise of his power, provided his act or his failure to act is in good faith. That may be true; but when he chooses to exercise his power

he must exercise the power within the framework of the agreement that confers the power on him. He may not, directly or indirectly, so use his power to vary the terms of the 1946 agreement. He may in fact release his power. Should he do so, he will be free to sell his 25% interest in any manner and for any price that he sees fit. But so long as he retains the power, affirmative in him, but a negative divestment of control in the owner of the 75% interest in the property, he must exercise it in strict accordance with the letter of the agreement that gives him the power.

We invent no new standard of duty. The fiduciary relationship between joint venturers has been long recognized (*Meinhard* v. *Salmon*, 249 N. Y. 458). The *Meinhard* case is not only an eloquent and inspired expression of applicable principles; it is an expression of fundamental morality cognizable in law that cannot be escaped merely by the device of full disclosure. It so happens that in the *Meinhard* case full disclosure would have been enough. Full disclosure will suffice where full disclosure will provide full protection and equality of bargaining position. Where full disclosure merely means that the party dealt with will know the details of his deprivation, but be impotent to prevent it, the one owing the duty is not discharged of responsibility. As in the *Meinhard* case, Murphy, by virtue of the 1946 agreement and his survivorship, became, like Salmon, '' much more than a coadventurer. He was a managing coadventurer '' (p. 468). Again, '' It is no answer for the fiduciary to say ' that he was not bound to risk his money as he did, or to go into the enterprise at all ' (*Beatty* v. *Guggenheim Exploration Co.*, 225 N. Y. 380, 385). ' He might have kept out of it altogether, but if he went in, he would not withhold from his employer the benefit of the bargain ' (*Beatty* v. *Guggenheim Exploration Co.*, *supra*). A constructive trust is then the remedial device through which preference of self is made subordinate to loyalty to others (*Beatty* v. *Guggenheim Exploration Co.*, *supra*). Many and varied are its phases and occasions (*Selwyn & Co.* v. *Waller*, 212 N. Y. 507, 512; *Robinson* v. *Jewett*, 116 N. Y. 40; cf. *Tournier* v. *Nat. Prov. & Union Bank*, 1924, 1 K. B. 461).'' (P. 467.)

More recently, the Court of Appeals, per FULD, J., speaking of a trustee, restated the rule as follows: '' A trustee may not be heard to assert that the corporate form of organization compels an otherwise unjustifiable extinction of the interest of the remaindermen in instances where, by reason of his stock ownership as individual and as trustee, he could have prevented it.

Under such circumstances, if an irreconcilable conflict between self-interest and fiduciary responsibility develops, the choice of the trustee is either to subordinate the former or resign; ' thought of self was to be renounced, however hard the abnegation.' (*Meinhard* v. *Salmon, supra,* 249 N. Y. 458, 468.) As to the plaint that application of that principle results in unfairness to the husband, let it be borne in mind that he voluntarily assumed his trusteeship. He was not obliged to become a trustee, ' but, as soon as he does so, he accepts whatever are the limitations, obligations and conditions attached to the position '. (*Gratz* v. *Claughton,* 187 F. 2d 46, 49.) '' (*Matter of Hubbell,* 302 N. Y. 246, 259.)

In the *Hubbell* case, the conflict arose from the trustee holding corporate stock in both his individual and fiduciary capacities. Here, Murphy holds his power of sale over his own interest and over the bulking interest of the estate in the property. Both cases involve real property operating at a loss, with a need in the estate to convert its property into income-providing assets. The court went on to say (pp. 259–260) : '' In thus holding that a duty existed on the part of the trustees to consent to a partial liquidation or dissolution of the Corporation in order to liquidate the stock held in trust, we dispose of any contention that the fiduciary, in his individual capacity, might have vetoed or prevented appropriate action by the Corporation towards that end. He may not use the corporate charter as a shield to protect himself from censure — for, as has been said, though in a different context (*Matter of Witkind, supra,* 167 Misc. 885, 893), ' Where as here the fiduciaries control a corporation by the help of the estate stock interest added to the stock interest held personally by one of them they are not disabled to make such accounts and are, therefore, under obligation to do so. There is nothing sacrosanct about a corporation. It is not an impenetrable screen behind which facts may be successfully hidden.' ''

The 1946 agreement is not sacrosanct, nor may it become an impenetrable screen.

A paradox worth commenting on is that the greatest need of the estate for liquidating this asset is the setting up of trusts for the decedent's widow. She is the one, however, who protests most vigorously at the proposed transaction. It is also worthy of note that although Taylor died in 1949, the only payments that the widow has received have been under the compulsion of court order. The only reason we mention this is because of the emphasis placed by petitioner upon the need for setting up the trusts to benefit the widow.

We note that we do not pass on whether in appropriate circumstances Murphy may be compelled to exercise his power of sale. No such question is presented to us.

We realize of course that in approving the settlement agreement, the learned Surrogate was convinced that it was for the best interests of the estate. He considered that the language of the survivorship clause left no other alternative. We hold that when Murphy chooses, if he does, to exercise his power he must do so within the framework of the agreement and not vary the percentages fixed therein.

The decree approving the proposed sale should be reversed and the proposed sale disapproved unless Mr. Murphy stipulates that, directly or indirectly, the proceeds received from the ultimate purchaser be divided in proportion to 75% and 25% between the estate and himself, in which event the decree should be modified in accordance with such stipulation and, as so modified, affirmed. Appellants are entitled to costs payable out of the estate. Settle order.

DORE, J. P., COHN and BERGAN, JJ., concur.

Decree, approving the proposed sale, unanimously reversed and the proposed sale disapproved unless Mr. Murphy stipulates that, directly or indirectly, the proceeds received from the ultimate purchaser be divided in proportion to 75% and 25% between the estate and himself, in which event the decree is modified in accordance with such stipulation and, as so modified, affirmed, with costs to the appellants payable out of the estate. Settle order on notice.