165 A.2d 741 (1960)
Alfred T. MANACHER, Plaintiff,
James N. Barroway, Blanche Barroway.
Clara Berkowitz, Ann Nemser, Norman S. Nemser, Ruth Gilbert, and Charles Heit, Intervening Plaintiffs,
v.
Richard S. REYNOLDS, Jr., et al., Defendants.
James N. BARROWAY and Blanche Barroway, Plaintiffs,
v.
UNITED STATES FOIL COMPANY, a Delaware corporation, Defendant.
Clara BERKOWITZ, Plaintiff,
v.
R. S. REYNOLDS, Jr., et al., Defendants.
James N. BARROWAY and Blanche Barroway, Plaintiffs,
v.
Richard S. REYNOLDS, Jr., et al., Defendants.
Court of Chancery of Delaware, New Castle.
October 21, 1960.
*742 Arthur G. Logan and C. Edward Duffy, of Logan, Marvel, Duffy & Boggs, Wilmington and Spear & Hill, New York City, for plaintiff Alfred T. Manacher in Civil Action No. 1129.
S. Samuel Arsht, Harvey S. Kronfeld and Richard H. Allen, of Morris, Nichols, Arsht & Tunnell, Wilmington, for James N. Barroway and Blanche Barroway as intervening plaintiffs in Civil Action No. 1129 and as plaintiffs in Civil Action No. 1312 and Civil Action No. 1320.
Irving Morris of Cohen & Morris, Wilmington, and Paul L. Ross and Martin Horwitz, New York City, for Clara Berkowitz as intervening plaintiff in Civil Action No. 1129 and as plaintiff in Civil Action No. 1314.
William E. Taylor, Jr., Wilmington, and Mortimer A. Shapiro and Stanley Nemser, New York City, for intervening plaintiffs, Ann Nemser and Norman Nemser in Civil Action No. 1129.
Ernest S. Wilson, Jr., Wilmington, and Louis H. O. Fischman, New York City, for intervening plaintiff, Ruth Gilbert in Civil Action No. 1129.
James Kruzinski, Wilmington, and Sidney L. Garwin, New York City, for intervening plaintiff, Charles Heit in Civil Action No. 1129.
David F. Anderson, of Berl, Potter & Anderson, Wilmington, for Charles Wallace, an objecting stockholder.
Abraham Hoffman, Wilmington, and Abraham I. Markowitz, New York City, for Helen Rosenfeld, an objecting stockholder.
*743 Aaron Finger, Richards, Layton & Finger, Wilmington, and Harold F. Reindel, Mathias F. Correa, Dudley B. Tenney and Howard W. Phillips, of Cahill, Gordon, Reindel & Ohl, New York City, for defendants in all actions.
SEITZ, Chancellor.
This is the decision on the fairness of a proposed settlement basically between the A and B stockholders of one of the corporate defendants, United States Foil Company ("Foil"), a Delaware corporation.
Foil was organized in 1919 with 15,000 shares of common stock. In 1924 its certificate was amended to create a new class of voting stock designated as Class B stock without voting power. The previously outstanding common stock was redesignated as Class A voting stock. The rights of both classes were the same except that the A had sole voting power in the absence of any pertinent statute. The amendment also provided for a plan whereby 13,500 of the 15,000 redesignated Class A shares could be exchanged for 135,000 shares of Class B.
The exchange of the 13,500 A for the B took place with the understanding that the Foil B would be listed on one of the two stock exchanges[1]. The remaining 1,500 shares of the redesignated Class A voting stock remained outstanding and are held today by the so-called "Reynolds' Group". This group consists of members of the Reynolds family, broadly speaking, who control the stock either as owners or trustees or by way of a foundation. Foil's capital structure is the same except for changes resulting from stock dividends and splits. There are now 8,594,032 shares of B and 540,000 shares of A outstanding.
In 1928 Foil, which up until that time had been a relatively small operating company, caused Reynolds Metals Company ("Metals") to be organized and transferred its manufacturing assets to it. It received in exchange common stock of Metals and participating preferred stock which was subsequently retired. Foil has continued to hold the controlling common stock interest in Metals as its principal asset (97.6%). At one time it had absolute voting control but in the middle fifties its direct holdings were reduced to something less than absolute control. It may be said that since 1928 Foil has not been, for all practical purposes, an operating company but has existed primarily to hold the stock of Metals.
Metals has grown until it is the second largest integrated producer of aluminum in the country. It has two classes of preferred and 17,001,399 shares of voting common outstanding; 8,014,055 being owned by Foil and 501,380 being owned by Reynolds Corporation. A majority of the Reynolds Corporation stock is owned by Foil. Consequently, by direct and indirect ownership, Foil controls 50.09% of Metals' common stock. Since Foil's voting stock is held by the Reynolds' Group they, in reality, have absolute voting control of Metals.
Metals has been traded on the New York Stock Exchange for some time and, as noted, the Foil B stock has unlisted trading privileges on the American Exchange. For many years the Foil B has sold on the market at about a one-third so-called "discount" from the value of the equity interest which it represented in the Metals' shares. Efforts have been made to educate the public and thus close the gap but they have not been successful. Some of the reasons for the so-called holding company discount are found in the additional expenses and taxes necessarily involved. The existence of the discount factor is of vital importance in this case. At the time of the proposed settlement it amounted to perhaps as much as $140,000,000, although the *744 Reynolds' Group contends it is substantially less.
The plaintiff, who commenced the action now sought to be settled, first purchased Foil B stock in 1947. He has no connection with the Reynolds' Group. His holdings were increased by purchases, stock dividends and splits until he now holds 125,000 shares, and is perhaps the largest individual holder of such stock.
The plaintiff contacted the Foil management many times in the last several years seeking, inter alia, some way by which the historic discount which existed between Foil B shares and the Metals' shares could be diminished or removed. He obtained no satisfaction. On June 10, 1958, he made a demand on the president of Foil that Foil be liquidated or reorganized or its corporate structure in relation to Metals be modified. In the same month Foil's board notified plaintiff that they had rejected his demand, saying it was not in the best long term interests of the company and its stockholders.
On April 15, 1959, plaintiff commenced the action here sought to be settled. He obtained jurisdiction over the appropriate parties including Foil, Metals and Reynolds Corporation. Thereafter defendants' filed a motion seeking dismissal of the complaint or, in the alternative, summary judgment in their favor. The matter was elaborately briefed and argued before the court in March of this year. While the matter was awaiting decision the parties informed the court that they had agreed on a proposed settlement and requested that the decision on the pending motion be held in abeyance.
The proposed settlement was noticed for hearing and resulted in the intervention of several shareholders for the purpose of objecting to the propriety and fairness of the settlement. Other stockholders objected without seeking to intervene formally. Certain stockholders also commenced independent actions and one sought a preliminary injunction to restrain in effect the effectuation of the proposed settlement. Those in all categories are collectively referred to here as "Objectors". The court consolidated the preliminary injunction applications with the hearing on the fairness of the settlement. This then is the decision on the approval of the proposed settlement and the application of Objectors to disapprove it or enjoin its effectuation.
In order to understand the proposed settlement it is of value to describe the relief requested by plaintiff in his original complaint. On behalf of the B, plaintiff sought the appointment of a receiver for Foil for the purpose of liquidating and distributing its assets to its stockholders. If such relief were granted the A and B shares of Foil would receive the Metals' stock share for share with the result that the Reynolds' Group would have through their various holdings 14.2% of the Metals common. I note that this includes holdings other than that based on its A ownership in Foil. Under the settlement here being reviewed, which will result in the elimination of Foil, the Reynolds' Group would have 17.4% of Metals common.
The plaintiff also sought to have the A shares cancelled. He sought a derivative judgment for damages to Foil resulting from the taxes paid and expenses incurred by Foil over the years. Plaintiff claimed they were unnecessary in the sense that such money could have been saved had the Reynolds' Group approved some plan by which the shares of Metals held by Foil were distributed to the Foil shareholders.
It thus can be seen that plaintiff's complaint basically sought relief which, if granted, would result in the distribution of the Metals' stock held by Foil and the consequent elimination of the discount factor. While plaintiff's complaint also contained a derivative action based upon the losses resulting from the continuation of Foil's existence, it is evident that this matter is directly related to and dependent upon the determination of the basic issue posed as to the legality of the continuation of Foil in its existing status. I do not *745 consider the prayer for cancellation of the A shares to be significant.
Plaintiff advanced two reasons why Foil should be dissolved by the court. He argued first that Foil's capital structure, under the facts, constituted an illegal voting trust. He next urged that Foil served no useful corporate purpose other than the interest of the Reynolds' Group. He conceded that there was no issue of waste of assets apart from the basic issue as to the right of Foil to continue in its existing status. The court had the advantage of the briefs and the argument prior to the hearing on the settlement and my reaction to the arguments is a substantial factor in my decision herein.
The evidence at the hearing on the fairness of the settlement demonstrated that plaintiff approached the spokesman for the Reynolds' Group to explore the possibility of settlement on the very day the argument on defendants' motions was held before the court. Thereafter, plaintiff submitted various plans to the spokesman for the Reynolds' Group, commencing with a suggestion that the Metals' shares held by Foil be distributed at a ratio of 1.1 shares of A to one share of B. This was summarily rejected. The plaintiff raised the ratio to 2 to 1 in favor of A and this was rejected. Finally, plaintiff suggested a 3 to 1 ratio. The proposed offer was accepted subject to receipt of a favorable tax ruling (which was obtained), the consummation of certain corporate transactions, and finally the approval of the plan by the court and the consequent dismissal of this action with prejudice. Although the Objectors attempted to show the contrary, I am satisfied that at all times the plaintiff, and not defendants, was the moving force in seeking a settlement. Even now some of the Reynolds' Group doubt the wisdom of the settlement from the viewpoint of their possibly losing control of Metals.
The mechanics of the proposed settlement are important. Foil's certificate was to be amended so as to reclassify the present outstanding Class A and Class B stock into a single class of common stock ("new stock"). Each share of the new stock was to have equal rights and full voting power. Under the plan of reclassification each outstanding share of Class A was to be converted into three shares of the new stock and each outstanding share of B stock was to be converted into one share of the new stock.
Following the reclassification, Foil and Reynolds Corporation are to be merged into Metals, which is to be the surviving corporation. In the merger the existing Metals' stock is to remain unchanged. The stock of the Reynolds Corporation, all of which is now held by either Foil or Metals, is to be cancelled. Each share of the outstanding new stock of Foil is to be exchanged for .85 of a share of Metals' common stock. The ratio of exchange in the merger was computed so as to reflect the actual pro rata interest of the holder of each share of new stock of Foil in Foil's assets  converting into the terms of Metals' common stock the fair value of assets other than Metals' common stock less liabilities and provisions for estimated expenses.
Measured by closing market prices on May 12, 1960, the day before the settlement offer was received, the holders of Class B stock of Foil will receive in lieu thereof Metals' common stock representing an increase in market value of $11.77 per share, or more than 30%. Such holders will also have full voting rights in Metals. While I take notice that the stock market has declined since May, I think it reasonable to infer that the value ratios here employed have remained fairly constant.
Under the plan, the Class A stock of Foil will receive 2.55 shares of Metals' common stock in place of each share of its stock. About 1.70 shares represents the two additional shares of Foil's new stock received as a result of the reclassification. The market value of the additional 1.70 shares as of May 12, 1960 was $97.54. I *746 shall assume that the Objectors are correct when they say that by virtue of the 3 for 1 conversion of the A, the A holders will obtain close to $40,000,000 which would go to the B, were the exchange on a share for share basis.
The votes of the stockholders of Foil on the reclassification and merger were taken before the hearing. The tabulation shows that 7,349,094 shares of stock (85.41% of the outstanding stock) voted for and 129,668 (1.51%) voted against the reclassification. Excluding the Reynolds' Group, the percentages were 80.73% and 1.9%. Considering only those actually voting, the percentage in favor was 97.59% to 2.41% against.
Prior to the hearing the court appointed an Amicus to analyze the issues and to suggest areas of productive testimony. His helpful report was filed and made available to the parties prior to the hearing. There was also substantial discovery. Trial procedures were adopted which offered all parties a reasonable opportunity to present their case and examine their opponents. I believe the decision can best be approached by considering the objections which the Objectors have vigorously and forcefully presented to the court by way of brief.
After the briefs were filed, the Objectors raised an issue as to whether or not Foil was barred under the Investment Company Act of 1940 from issuing any prospectus, etc. because it was not registered thereunder. Having read 15 U.S.C. A. §§ 80a-3(b) (2)[2] and 80a-3(a) (3)[3] in conjunction with the opinion of the Commission granting Foil an exempt status in 1941, I am satisfied that the shift from majority to less than direct majority ownership in Metals would not automatically require the Commission to deprive it of its exempt status. The opinion makes it evident, particularly in its preliminary language, that the percentage of the stock ownership was but one factor relevant to the Commission's determination. The statute clearly visualizes an overall evaluation by the Commission. Certainly such an evaluation would not overlook the fact that through its stock ownership in Reynolds Corporation, Foil continued to have absolute corporate control of Metals.
Since there are no facts other than a shift from direct majority control relied upon to show that Foil lost its exempt status, and assuming the doubtful point that this court has the power to consider this particular issue in view of the language of 15 U.S. *747 C.A. § 80a-3(b) (2), I conclude that the Objectors have not demonstrated that Foil is in violation of the Investment Company Act of 1940. Cases such as Breswick & Co. v. United States, D.C., 134 F.Supp. 132, are not pertinent to the basically discretionary determination called for by these sections of the Act.
I next consider the Objectors' contention that this court does not have jurisdiction to approve this compromise because the component parts of the settlement are in effect so unrelated to the objects of the original complaint that they are not germane thereto. The Objectors say that this court is being asked in effect to approve a reclassification and merger in the settlement of an action seeking an appointment of a liquidating receiver as well as the cancellation of shares and a money judgment. The court perhaps must do this because of the independent actions seeking preliminary injunctions.
In any event, I think the Objectors fail to distinguish between the mechanics of a settlement and the substance thereof. Stripped of its mechanical aspects, the settlement, if approved, will result in the elimination of Foil and thus of the discount factor. It will also result in the B shareholders of Foil becoming voting shareholders of Metals. When these terms are compared with the basic relief sought in the complaint, namely, the appointment of a receiver to distribute Foil's assets, which would largely mean the distribution of Metals' stock, it is evident that the settlement terms accomplish the basic objectives of the lawsuit.
A settlement may take many forms and the court must be careful not to permit it to become a vehicle to obtain blanket judicial approval of unrelated matters or transactions having important future imponderables. This I think was the purport of the Vice Chancellor's opinion in Nadler v. Bethlehem Steel Corp., Del.Ch., 154 A.2d 146. However, it seems to the court that all the facts pertinent to a fair evaluation of the present reclassification and merger are before the court and thus there is no danger of prejudging the application of a plan where there are future imponderables of substance.
I conclude that the court does have jurisdiction to pass upon the fairness of the proposed settlement. No question is raised as to the fairness of the transaction to Metals and its stockholders and so I express no opinion thereon.
Two objections are made to the settlement on the ground that certain claims in the complaint are being released without any consideration. The Objectors formulate these contentions in terms of the court's lack of jurisdiction to approve the settlement but I do not believe they are jurisdictional. They relate to the question of the fairness of the settlement.
The Objectors first contend that Foil is releasing without consideration its claim for a money judgment against certain of the individual defendants. They say that this is nothing more than a gift demanded and taken by such defendants to perform their duties as directors and managers of Foil.
The only charge against the directors arises from the claim that Foil should not have continued in existence and indeed was illegally in existence. Thus, the basis for the claim turns on the determination of whether or not the original complaint contained a meritorious claim for liquidation, a matter later considered. When the issue is seen in this relationship it seems apparent to the court that the so-called waste was an issue which could properly be assimilated with and disposed of as a part of the compromise on the issue of liquidation. This is not a case where the cause of action was a clear cut claim of wrongful conduct of directors of the type generally considered. Furthermore, I think it should be kept in mind that every claim in a complaint need not be supported by independent consideration in *748 order to justify the approval of a settlement. The court must consider each case on its own merits.
I conclude that the court has the power to approve the settlement and that the lack of consideration allegedly running from the individual defendants to Foil for the particular cause of action is no bar to approval.
The Objectors contend that the court lacks jurisdiction because the cause of action in the original complaint to cancel the A shares is to be released without consideration. Once again the court is satisfied that this matter is inextricably bound up with the basic objective sought by plaintiff and therefore is fairly encompassed within the subject matter of the settlement even though no consideration is directly allocated to the release of this particular claim. Whether another situation might require an explanation of the treatment of each claim in negotiating the settlement, I need not consider. There is no merit to this contention of the Objectors.
I come now to the question as to the burden of proof. The Objectors claim that the proponents of the settlement have the burden of showing its fairness while the proponents claim that the independent stockholders' approval shifted that burden to the Objectors.
The board of Foil is admittedly "interested" and so the question of the effect of independent board approval of the settlement is not involved. While there is some logic to the view that independent stockholder approval should shift the burden of showing unfairness to the Objectors, I shall proceed on the assumption that independent stockholders' approval is but one factor, albeit an important one, to consider in the judicial process of resolving the "fairness" issue. Compare Berger v. Dyson, D.C., 111 F.Supp. 533. In litigation, as opposed to settlements, where an interested board is involved, the court generally does shift the burden to the Objector upon a showing of independent stockholder approval. Compare Gottlieb v. Heyden Chemical Corp., 33 Del.Ch. 177, 91 A.2d 57. That rule would perhaps have been applied here were the court only concerned with the preliminary injunction applications. But I need not decide that issue because the court is also called upon to pass upon the fairness of the settlement and the court has assumed that the proponents have the laboring oar.
This brings the court to the issue of the "fairness" of the settlement. In approaching this problem I do not attach any weight to the board's "interested" approval. The court's function basically is "to consider and weigh the nature of the claim, the possible defenses, and to exercise business judgment in determining whether or not the proposed settlement is reasonable." Krinsky v. Helfand, Del., 156 A.2d 90, 94.
The court is met at the outset with the Objectors' contention that the officials of Foil, being members of the Reynolds' Group, violated a fiduciary duty which they owed the B shareholders. It consisted of their exacting the 3 for 1 premium as their price for letting "their" board act on a merger which they could not prevent by their votes as stockholders. Was the Reynolds' Group prohibited from asking for the premium as a condition to their agreeing to vote in favor of the merger?
The record shows quite clearly that the settlement was actually an arms-length transaction involving the Reynolds' Group on one side and plaintiff, as representative of the B, on the other, and plaintiff, not the Reynolds' Group, was the moving force. There is no question of collusion or bad faith. It is true that the directors controlled by the A had to agree to exercise their corporate positions in a particular way before there could be a settlement. But, I think that factor not decisive here. This transaction involved an unconcealed attempt to adjust rights between classes of stock and no "advantage" was taken of *749 superior knowledge, etc. The B stockholders were fully advised and, of real importance, had to give their approval as a condition precedent to court approval. They were not controlled by the Reynolds Group. Under such circumstances I do not believe the officials of Foil or its A stockholders breached any fiduciary duty owed the B. Precise precedents have not been cited but analogous situations support my conclusion. Compare Goldman v. Postal Telegraph, D.C.D.Del., 52 F.Supp. 763; Bailey v. Tubize Rayon Corp., D.C.D.Del., 56 F.Supp. 418; 3 Fletcher, Cyc. of Corps. (perm. ed.) § 900; Tryon v. Smith, 191 Or. 172, 229 P.2d 251.
Objectors rely heavily on Lebold v. Inland Steel Co., 7 Cir., 125 F.2d 369 and Zahn v. Transamerica Corp., 3 Cir., 162 F. 2d 36, 172 A.L.R. 495. In Lebold the majority stockholders took action to the prejudice of the minority and the corporation. The minority was powerless to prevent it without court assistance. Here the "adverse" interest, viz., the B, had to give its approval or there could be no settlement. The Zahn case involved a use of majority stockholder power and corporate control to take advantage of superior knowledge concerning the value of the corporation's assets. No such situation is here presented. The facts here were apparent to everyone who took the trouble to look.
Other cases cited by the Objectors, such as In re Hubbell's Will, 302 N.Y. 246, 97 N.E.2d 888, 47 A.L.R.2d 176 and In re Taylor's Will, 282 App.Div. 304, 122 N.Y.S.2d 500, are not in point. They involved a conflict between a Trustee's duty and his personal interest. To be somewhat analogous we would have to assume a duty on the Foil directors to take the action sought in substance by the complaint, a point next considered.
In weighing the fairness of the settlement, I now evaluate the nature of the claim and possible defenses. In approaching these factors I need not decide the merits of the lawsuit being settled. Perrine v. Pennroad Corp., 29 Del.Ch. 531, 47 A.2d 479. However, the court is in a particularly good position to evaluate the merits for the purposes of appraising the risk inherent in disapproval of the settlement. I say this because, at the time the settlement was proposed, the case was awaiting decision after discovery, briefing and argument on defendants' motions to dismiss or for summary judgment.
The Objectors seem almost to assume that plaintiff would have been successful on the merits. They base their contention on the testimony at the settlement tending to show that the continuance of Foil serves no real purpose other than the preservation of the A's voting power and thus constitutes a violation of a fiduciary duty owed the B.
Certainly the plaintiff had a difficult case either on the theory that the Class A charter provision was an illegal voting trust or on the claim that Foil served no useful corporate purpose. Stripped of its facade, plaintiff was arguing that under the law of Delaware a holding company which was controlled by one class of voting stock held by one "interest" and which had only one substantial asset  stock ownership representing control of an operating company  could be dissolved at the instance of the non-voting class.
Foil is not insolvent and no charge of mismanagement is involved apart from the complaint that the expenses inherent in its existence were unnecessary. Certainly, one could have anticipated that plaintiff would have had real difficulty in persuading the court that it should establish the precedents inherent in plaintiff's positions. I say this because such precedents would cast a legal cloud over "family" and other holding companies, without even a hint in any of the precedents that the use of such a device might in and of itself be illegal or not serve a proper corporate purpose. See the situations considered in Allaun v. Consolidated Oil Co., 16 Del.Ch. 318, 147 A. 257 and Adams v. Clearance Corp., 35 Del.Ch. *750 318, 116 A.2d 893, affirmed 35 Del.Ch. 459, 121 A.2d 302. The stockholders must be held to have entered into this situation with their eyes wide open. If the form or purpose of Foil was to be altered, it was to be expected that it would be as the result of the application of non-legal forces, e. g., stock exchange, underwriter, etc.
Generalizing then, I think that there is substantial doubt that plaintiff would have been successful on the merits, either in this court or on appeal. The importance of this evaluation of the complaint has a pervasive importance in resolving the fairness issue. It might be noted that even if plaintiff were successful in the sense that the Metals' stock had to be distributed, there would possibly be a tax thereon which would exceed the premium paid the A under the settlement, which is presently tax free.
I next consider the terms of the settlement. The Objectors contend that they constitute nothing but a gift of a large portion of B's equity in Metals to A. The parties are in real disagreement on the values involved under the terms of the settlement. I will use those employed by the Objectors.
Under the plan each B share will receive $5.16 less than it would receive were the conversion after reclassification on a 1 for 1 basis. The Objectors say that under the plan the A is exacting from the B a 4% premium amounting to about $40,000,000 without any recognizable benefit passing to the B. The proponents of the settlement say that under the plan the B stock, based on the settlement date values, would benefit market-wise to the extent of about $100,000,000. This comes from the elimination of the discount factor which, indeed, did take place within a few days after the release of the news of the proposed settlement. It may be expected that the "discount" will reappear if the settlement is disapproved.
It is of preliminary importance to consider what the "discount" involves. It means, as indicated, that the Foil B is selling at one third less than its "equity" in Metals. In a theoretical sense it could be said that the "value" represented by the amount of the discount belong to the B. However, such value could not be realized by the B apart from some plan which altered Foil's corporate structure. Indeed, it has existed for such a long period that the court may fairly assume that the B shares were largely acquired with knowledge thereof. The issue is whether the A may fairly agree with the B to take appropriate action to remove the discount in return for premium amounting to one-third of the discount.
The Reynolds' Group claims that the primary justification for the "premium" paid the A is found in the fact that the A is relinquishing its sole voting rights in Foil and thus permitting a merger with Metals which is of great value to the B stockholders. Let us examine this contention because it is at the heart of the case.
Assuming that plaintiff's complaint would be determined to be without merit, the A could continue indefinitely their absolute control of Foil and indirectly of Metals. The important consequence of the continuation of this situation is that the B would continue to sell at the one-third discount heretofore mentioned. The taxes and expenses paid by Foil would also continue.
By relinquishing absolute control of Foil the A will give up a valuable right which they now possess. Such relinquishment will benefit the B shares. The principal benefit will come from the elimination of the discount. The Objectors appear to argue that the "discount" is not something of value passing from the A to the B. Assuming the complaint to be without merit, the hard fact of life is that the proposed action by the A is an indispensable prerequisite to the realization of any benefit by the B from the elimination of the discount. Compare Porges v. Vadsco Sales Corp., 27 Del.Ch. 127, 32 A.2d 148. So viewed, there is a proximate relationship between the A's giving up absolute voting control of Foil and *751 the elimination of the discount factor with its resulting benefit to the B shares.
The Objectors also argue that the relinquishment by the A of its exclusive voting rights under the reclassification is an illusory consideration. This is so because the B will never have an opportunity to exercise their new voting rights since the merger will immediately follow. But the answer to the Objectors' contention is that the principal benefit to the B is not the obtaining of voting rights in Foil and ultimately in Metals but the elimination of the discount. This will result, and indeed has resulted, in a great increase in the market value of Foil.
One further point made by the Objectors requires discussion. They say it is the control of Metals which is involved and it belongs to Foil, not the Class A. It is Foil's status which creates the discount factor and its elimination requires action by the A, assuming the complaint is without merit. The issue then is as to the fairness of the premium demanded for such action.
The Objectors next contend that the premium paid the A cannot be considered in determining "fairness" because control of Foil is a corporate asset, citing Gerdes v. Reynolds, Sup., 28 N.Y.S.2d 622; Perlman v. Feldmann, 2 Cir., 219 F.2d 173, 50 A.L.R.2d 1134; Jennings, Trading in Corporate Control, 44 Cal.L.Rev. 1, 31. Mr. Berle clearly takes this view. Berle & Means, The Modern Corporation and Private Property, 243.
Certainly the Gerdes case does not support the Objectors' contention. It stands, inter alia, for the proposition that stockholder-directors selling "control" have, under some circumstances, a fiduciary duty to others interested in the company. Compare Insuranshares Corp. of Delaware v. Northern Fiscal Corp., D.C.E.D.Pa., 35 F.Supp. 22. But it does not hold that the premium is a corporate asset. It does hold that the payment of an excessive premium may charge a seller with notice of a fraudulent scheme on the part of the buyer.
As to the Perlman case, which made such an impact on the legal fraternity, I think it may be distinguished on the ground that its shares were sold to a buyer with predictable resultant sacrifice in the corporation's good will. If this distinction lacks substance, I can only express a preference for the dissent's view that the increment in stock value arising from control belongs to the sellers, absent some breach of duty. I say this because I am satisfied that a practical decision of this issue has been in existence in the business community for too many years for a court to upset it. Moreover, the implications inherent in the adoption of the rule espoused by Mr. Berle would create more doubts than it would resolve. The Jennings article relied upon by the Objectors suggests an approach which is not applicable to the present facts.
The Objectors seem to suggest that perhaps the A could exact a premium for selling its controlling stock to an outsider. But they insist that the B will not acquire control and yet is paying the premium. Once again, I think the Objectors' emphasis is misplaced. The A must give up their absolute voting control or the B will not receive the market benefit resulting from the removal of the discount. It does not mean that they must give such control to the B. The Objectors' argument is more properly considered in determining whether the premium demanded of the B is fair since the B will not obtain voting control of Metals.
The Objectors make the related argument that the A are not giving up voting control because they will still have working control of Metals after the merger. This is true, although I point out that this conclusion requires the court to include shares of Metals held by the Reynolds' Group other than those to be received under the terms of the merger. It is still true that the A must give up their absolute voting control of Foil and thus of Metals if the B are to benefit. The *752 question is what may they fairly exact for that important change of position.
Having concluded that the A may claim a premium for the relinquishment of absolute control, whether it be considered to be of Foil or Metals, I next consider the Objectors' argument that it is not right to treat all the A shares as controlling shares. The Objectors point out that controlling blocks of A are in four trusts administered by a common trustee, the president of Metals and Foil. The difficulty with this argument is that any one of several combinations of the A could be said to be the controlling shares. The A shares present and are entitled to present a united front on this issue. The court is therefore not entitled to fragment such shares and say that some other plan is more realistic.
I come now to the issue of the reasonableness of the amount exacted by the A for the relinquishment of absolute control with its consequent ultimate benefit in market value and voting rights to the B upon becoming Metals' stockholders.
I should say preliminarily that I reject any implication in the Objectors' brief that the plaintiff did not bargain at arms-length and in good faith when arriving at the terms of the settlement with the Reynolds' Group. By accepting the 3 for 1 ratio the plaintiff was taking about $600,000 less than he would receive on an even exchange. This is almost as much as the "premium" to be paid by all the Objectors. While it can be said that plaintiff had more to gain too, I do think it significant that this large investor made the decision after a long struggle and with knowledge of the financial facts. The Objectors say the plaintiff was ignorant of other precedents and thus was not prepared in his negotiations. I think the answer must be that had he known the precedents they would not have been of controlling importance in this A versus B negotiation.
The proponents of the settlement offered as an expert witness, Mr. Brandi, president of Dillon, Read & Co., Inc., a well known investment house. He testified in part as follows:
"Q. Do you have any opinion, sir, as to whether a block of stock which represents control or carries with it control of a company of the nature and importance of Reynolds Metals, is worth more or less per share than its otherwise normal market value, if any ? A. I think control of a corporation is practically always worth more than the market value of an ordinary share.
"Q. That is of the  A. Of the corporation.
"Q. That is, the shares of the block which makes up and constitutes control? A. That's true.
"Q. Specifically in this situation would you have any view as to whether that would be true of the holdings of Foil A stock of the Reynolds family group? A. I think control of Reynolds Metals, which has assets of close to a billion dollars and has grown very rapidly in the past and is expected to grow in the future  sales of five hundred million dollars, assets of a billion dollars, and forty million net earnings  control of that company, particularly if it can be obtained through a fairly small investment in a holding company, would be worth a great deal more than the market of that holding company for non voting stock.
"Q. Have you formed any opinion as to how much more? A. Well, I believe that you could readily obtain forty to fifty million dollars in excess of break-up value for the right to control Reynolds Metals.
"The Court: Just to be explicit, when you talk of this value, it is value to whom?
"The Witness: Value to a willing buyer, buying from a willing seller. If *753 I were to be asked about U. S. Foil A stock  to a large stock corporation or a large copper company, or someone who would want to go into this business and buy control of it."
By Mr. Correa:
"Q. Now, sir, you based that valuation on a sale, as you just told his Honor, to a willing buyer? A. Yes.
"Q. Can you tell us whether or not the same value would apply to a relinquishment of the control of a company such as Reynolds Metals? A. I think the value which you can obtain for something such as control is an important factor in determining the value of relinquishing something.
"Q. In other words, perhaps if I understand correctly, what you are saying is that where you relinquish something for value, that value should be what you could get for it if you sold it to someone? A. I don't think it would necessarily be the entire amount, but it is something close to it.
"Q. Do you know of any instance or instances where the holders of voting stock have received a premium, if you call it that, of something in excess of breakup value for relinquishing their control or a part thereof ? A. There is only one instance I know of involving a large national company, and that is the Ford Company. * * *"
Mr. Brandi also testified that in his opinion the settlement represented fair treatment for the A and B holders and based his opinion on "the history of the two companies, the capitalization of the two companies, the outlook, the importance of the Reynolds family's present position, the situation therein when this settlement is approved, * * *".
While Mr. Brandi conceded that relinquishment of control by a means other than sale would call for a lesser value, he felt the value would be "close" to sale value. In giving this answer, it is not clear whether Mr. Brandi was assuming a continuing working control in the A after the relinquishment of absolute control. However, I assume that he was so assuming in view of his later testimony that he considered this settlement to be fair. The court has substantial doubt that the relinquishment of absolute voting control but the retention of working control has a value "close" to that which would be involved in sale of absolute control to a willing buyer.
The Objectors point to certain evidence which they contend demonstrates beyond doubt that the A stock is not worth more than the B stock. They first point to the fact that the two classes are identical except that the A has voting rights. This of course means only that the justification for the granting of the premium must be found in the treatment of voting rights in the settlement.
They next point to the fact that for several years past the four Reynolds Brothers and their mother have stated in tax returns that the fair market value of a share of A stock is no higher than that of the B stock. Indeed, they have complained that the A is worth less presumably because it has no established market.
Defendants respond to this contention by conceding that shares of A which do not represent control cannot command a premium and they point out that the shares mentioned did not represent "control".
Standard Research Consultants, Inc., one of the leading stock evaluation firms in the country, made a study and report, at the request of the Reynolds family, of the fair market value of the large blocks of A and B stock owned by the estate of the father of the present president of Foil. Standard's conclusion was that no value should be added to the estate's A shares because of their voting rights and that both A and B had the same fair market value. The Reynolds family used this report in certain *754 proceedings before the Internal Revenue Service and the tax courts involving the evaluation of the A and B stock. Objectors also point out that the Reynolds Corporation, which is owned by Foil and Metals, sold shares of A stock to the Reynolds Foundation in December 1955 for a price equivalent to the then quoted market price of the B stock.
The defendants respond by pointing out that the Standard report itself stated "* * * that except where control is a factor, prices of voting and non-voting shares tend to approximate each other". I think it is evident that the evidence adduced by the Objectors only tends to emphasize the importance of the issue concerning the fairness of the premium paid for the relinquishment of absolute voting control  a value factor above and beyond the fair value attributable to any particular share of A stock.
The Objectors point out that many operating corporations have two classes of publicly traded stock whose rights are identical except that one class has voting rights and the other does not. In all such cases there is no significant difference between the market prices of the classes of stock. The answer here is that the absolute voting control of the A makes the difference.
The Objectors introduced evidence to show that in every known case in which a corporation, whose stock was publicly held, reclassified its voting and non-voting stock into a single class of voting stock, the reclassification was on a share for share basis for both classes. Some of these corporations were large and in some cases voting control was in the hands of a single family or entity group. It does not clearly appear why those having voting control were willing to give up that control without seeking a premium. There might have been very practical reasons why they had wanted to do so. Thus I do not believe they were subject to litigation. Indeed, the financial situation of the companies may have been such that a share for share exchange in effect represented the payment of a premium to the voting shares. I only mention these points to show the difficulty of inferring from these precedents that a premium is unwarranted here.
The Objectors claim that the settlement in effect provides for liquidation of Foil and in a liquidation the rights of the A and B shares are identical. As I have suggested, there is extreme doubt that the plaintiff can legally force a liquidation of Foil. Compare Porges v. Vadsco Sales Corp., above. This being so, the A shareholders hold the key with which to unlock the "discount" treasure chest for the B. No other factor being present, they may demand a reasonable premium for the use of their key.
I return to the central question: What was the A fairly entitled to exact from the B for the rights relinquished and the consequent benefits to the B?
The court frankly does not believe there is any explicit evidence of the value of relinquishing absolute control which would justify the conclusion that a particular figure would be fair to the A and B. For the reasons already stated herein, I do not believe the basis for Mr. Brandi's testimony as to the value of relinquishing control is sound here. I must frankly say that were I to view the case apart from the stockholder action I would conclude that the premium is excessive. I say this because the discount factor is not a "value" which can be attributed to the A. Moreover, the A will retain working control. I do however, recognize that the A may fairly exact a premium as a condition to the relinquishment of absolute voting control. I ask then whether, in the setting, the independent stockholder action changes my opinion.
The court is met at the outset with the Objectors' contention that the stockholders did not approve the settlement because they were not asked to do so. This contention is without merit. The terms of settlement were submitted to them and explained in *755 detail. They were required to vote in favor of the reclassification and merger as a prerequisite to the presentation of the settlement to the court. Thus, the Foil proxy statement contained the following statement:
"The proposed Reclassification and Merger are the principal terms of an offer of settlement in an action in the Court of Chancery of Delaware against Foil and others, all of which is more fully described under `Proposed Settlement of Litigation'. Approval of the Reclassification and Merger will constitute approval by the stockholders of the settlement offer."
But the Objectors say that the stockholders were told that the fairness of the plan had to be passed on by the court and thus the stockholders were leaving it to the court to make the judgment as to fairness. The great bulk of the stockholders were asked to approve and did approve the settlement. Presumably they contrasted the "gain" arising from the settlement with the "loss" and risk inherent in disapproval.
I am satisfied that the Foil stockholder vote on the reclassification constituted approval of the settlement. No objection to the sufficiency of the notice to the stockholders is briefed and so an adequate notice will be assumed.
What weight should the court give to independent stockholder approval in passing upon the fairness of the reclassification ratio?
The authorities quite generally give great weight to this factor for the basic reason that it is the stockholders' money which is involved. Krinsky v. Helfand, above; Perrine v. Pennroad Corp. above; Porges v. Vadsco Sales Corp., above.
Excluding the Reynolds' Group, 80.73% of the B stockholders (7,349,094 shares) approved the settlement, with what I must assume is a full realization of the premium to be paid the A. In contrast, 1.51% representing 129,668 shares voted against the settlement. Of those voting, 97.59% voted affirmatively.
Obviously, a majority stockholder cannot arbitrarily vote to give away rights belonging equally to an objecting minority. But here the B stockholders are not giving up any element of realizable value which exists in the B apart from a settlement or the successful outcome of the litigation. The shareholders were entitled to conclude that they wanted to pay the premium rather than risk the loss of the substantial increase in value in their shares which had already been realized in paper form when they voted.
The approval of a settlement requires the court, inter alia, to exercise a business judgment. Under such an approach the court would be hesitant to say that the settlement was so unfair that it should be rejected. It was plaintiff, not defendants, who sought the settlement. Certainly any court, aware of the weakness of the case on the merits, would be reluctant to say that such an overwhelming majority of the stockholders had to receive exactly the same treatment as the A or perhaps receive nothing. Compare Cole v. National Cash Credit Ass'n, 18 Del.Ch. 47, 156 A. 183; Davis v. Louisville Gas & Electric Co., 16 Del.Ch. 157, 142 A. 654. This is particularly true when they are deciding on a "value" which can be created only by change in Foil which requires action by the A. Assuming the complaint to be without merit, I emphasize again that the settlement does not allocate to the A any of the value which the B could otherwise command.
The Objectors also argue that the trebling of the A shares, including those held by Reynolds Corporation, discriminates in favor of Metals' public shareholders at the expense of Foil's B stockholders. This amounts to an argument that the merger is unfair to the B because it results in $4,630,966 less of Metals' stock being issued than would be issued if there were a 1 for 1 ratio employed. As the defendants point out, this is a consequence of the reclassification when considered in conjunction with *756 the various stockholdings of Foil, Metals and Reynolds Corporation. It would appear that the method employed is at least an equitable method of determining the exchange ratio to be applied in the merger. Certainly the fact that fewer Metals' shares will be outstanding will also be of benefit to the present Foil B shareholders too.
I conclude that when overwhelming stockholder approval is added to the facts, it justifies a business-judgment approval of the settlement. Assuming that I am also required to pass upon the fairness of the reclassification and merger as separate issues because of the independent actions, I conclude that their terms are fair in this setting. It follows that the requests for preliminary injunctions in the independent actions will also be denied.
Present order on notice.
NOTES
[1] The Objectors suggest that the management never complied with one of the terms of the amendment because the B even today is not a "listed" stock, since it only has unlisted trading privileges on the American Exchange. Whatever the implications of this ancient history are, I do not believe they are relevant to the present controversy.
[2] "(b) Notwithstanding paragraph (3) of subsection (a) of this section, none of the following persons is an investment company within the meaning of this subchapter and sections 72(a) and 107(f) of Title 11 * * *".

"(2) Any issuer which the Commission, upon application by such issuer, finds and by order declares to be primarily engaged in a business or businesses other than that of investing, reinvesting, owning, holding, or trading in securities either directly or (A) through majority-owned subsidiaries or (B) through controlled companies conducting similar types of businesses. The filing of an application under this paragraph by an issuer other than a registered investment company shall exempt the applicant for a period of sixty days from all provisions of this subchapter and sections 72 (a) and 107(f) of Title 11 applicable to investment companies as such. For cause shown, the Commission by order may extend such period of exemption for an additional period or periods. Whenever the Commission, upon its own motion or upon application, finds that the circumstances which gave rise to the issuance of an order granting an application under this paragraph no longer exist, the Commission shall by order revoke such order."
[3] "(a) When used in this subchapter and sections 72(a) and 107(f) of Title 11, `investment company' means any issuer which * * *".

"(3) is engaged or proposes to engage in the business of investing, reinvesting, owning, holding, or trading in securities, and owns or proposes to acquire investment securities having a value exceeding 40 per centum of the value of such issuer's total assets (exclusive of Government securities and cash items) on an unconsolidated basis."